**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CTK, LLC., a Kansas<br>limited liability company | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | **FILED: JULY 16, 2008** |
| | ) | **08CV4044** |
| v. | ) | Case No. |
| | ) | **JUDGE NORDBERG** |
| | ) | **MAGISTRATE JUDGE NOLAN** |
| | ) | **AEE** |
| STARBUCKS CORPORATION, | ) | |
| a Washington corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>COMPLAINT</u>

Plaintiff, CTK, LLC., a Kansas limited liability company ("CTK"), by and through its

attorneys of record, for its Complaint against Defendant, STARBUCKS CORPORATION, a

Washington corporation, ("Starbucks") as follows:

### <u>PARTIES, JURISDICTION AND VENUE</u>

1.　　CTK is a Kansas limited liability company with its principal place of business

located in Leawood, Kansas.  The individual members of CTK reside in Kansas

and are diverse from all defendants in this matter.

2.　　Starbucks is a Washington corporation with its principal place of business located

in Seattle, Washington.

3.　　Jurisdiction in this matter is proper under 28 U.S.C. § 1332 (a).

4.　　The amount in controversy exceeds $75,000 exclusive of interest and costs.

5.　　Venue is proper under 28 U.S.C. § 1391 as Starbucks entered into a contract in

this district, the action involves real estate located in this District and the cause of

action arose in this district.

## <u>FACTS COMMON TO ALL COUNTS</u>

6.     At all times relevant hereto, CTK was the owner of a real estate parcel located at the Northeast Corner of President Street and Roosevelt Road in Wheaton, Illinois (the "Property").

7.     On or about September 13, 2007, CTK entered into a lease agreement with Starbucks (the "Lease") wherein Starbucks agreed to lease the Property for a period of ten (10) years for the amounts set forth in the Lease.  A copy of the Lease is attached hereto as Exhibit A.

8.     CTK fully performed all of its obligations pursuant to the Lease and incurred costs and expenses to prepare the Property for Starbuck's tenancy.

9.     In accordance with the Lease, CTK did not entertain any other leasing opportunities for the Property in reliance upon Starbuck's performance of its obligations pursuant to the Lease.

10.     On or about February of 2008, after entering into the Lease, but prior to physical possession of the Property, Starbucks advised CTK that Starbucks was not going to honor the terms of the Lease and directed CTK to cease and desist its development of the Property.

11.     By failing to honor the Lease, Starbucks has breached its lease contract with CTK.

12.     As a direct result of Starbuck's breach of the contract, CTK has been damaged in an amount to be determined at trial in excess of $75,000.00, exclusive of interest and costs.

13.     By failing to honor the terms of the Lease, Starbuck's has vexatiously delayed payment, entitling CTK to pre-judgment interest pursuant to statute.

14.     Pursuant to the Lease, in the event of an action to enforce the terms of the Lease, the prevailing party in such action shall be entitled to its attorneys' fees to be paid by the non-prevailing party.

WHEREFORE, Plaintiff, CTK, LLC., respectfully prays for the entry of a judgment against Defendant, Starbucks Corporation, a Washington corporation in an amount to be calculated at trial, plus attorneys' fees, costs of suit, pre-judgment interest and any other such further relief as this Honorable Court deems just and appropriate.

Respectfully submitted;

CTK, LLC, a Kansas limited
liability company,


By: s/  Eric D. Kaplan_____
        One of its attorneys

Eric D. Kaplan
Jared I. Rothkopf
**KAPLAN PAPADAKIS & GOURNIS, P.C.**
180 North LaSalle Street
Suite 2108
Chicago, Illinois 60601
(312) 726-0531

COMMERCIAL LEASE

Wheaton, Roosevelt & President
Wheaton, Illinois

between

CTK, LLC

and

STARBUCKS CORPORATION

STARBUCKS



EXHIBIT
A

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1. | PREMISES | 1 |
| | 1.1 Premises | 1 |
| 2. | TERM | 3 |
| | 2.1 Term | 3 |
| | 2.2 Delivery | 4 |
| | 2.3 Lease Year | 6 |
| | 2.4 Extension | 6 |
| 3. | RENT | 8 |
| | 3.1 Base Rent | 8 |
| 4. | CONDITION OF THE PREMISES, POSSESSION AND TENANT ALLOWANCE | 10 |
| | 4.1 Condition of the Premises | 10 |
| | 4.2 Landlord's Obligations | 11 |
| | 4.3 Delay in Delivery of Possession | 14 |
| | 4.4 Tenant Allowance | 17 |
| | 4.5 Independent Measurement of Premises | 18 |
| | 4.6 Landlord's Building Plans | 18 |
| 5. | USE | 20 |
| | 5.1 Use | 20 |
| | 5.2 Compliance with Law | 21 |
| | 5.3 Operations | 22 |
| | 5.4 Exclusivity | 22 |
| 6. | MAINTENANCE, REPAIRS, AND ALTERATIONS | 23 |
| | 6.1 Tenant's Obligations | 23 |
| | 6.2 Landlord's Obligations | 24 |
| | 6.3 Surrender | 27 |
| | 6.4 Landlord's Rights | 27 |
| | 6.5 Alterations and Additions | 28 |
| | 6.6 Ownership and Removal of Improvements, Fixtures, Equipment and Furnishings | 31 |
| 7. | INSURANCE; INDEMNITY | 32 |
| | 7.1 Tenant's Insurance | 32 |
| | 7.2 Landlord's Insurance | 34 |
| | 7.3 Waiver of Subrogation | 36 |
| | 7.4 Indemnification by Tenant | 37 |
| | 7.5 Indemnification by Landlord | 38 |
| 8. | ENVIRONMENTAL LIABILITY | 39 |
| | 8.1 Environmental Law | 39 |
| | 8.2 Hazardous Substance | 39 |
| | 8.3 Landlord's Covenants | 40 |
| | 8.4 Tenant's Use of Any Hazardous Substance | 40 |
| | 8.5 Indemnities | 49 |
| 9. | DAMAGE OR DESTRUCTION | 51 |
| | 9.1 Material Damage | 51 |
| | 9.2 Repair After Damage | 52 |
| | 9.3 Uninsured Damage | 53 |
| | 9.4 Damage During Final Two Years | 53 |
| | 9.5 Abatement of Rent | 54 |
| 10. | PROPERTY TAXES | 54 |
| | 10.1 Definition of "Real Property Taxes" | 54 |

10.2 Proration of Real Property Taxes ......... 57
10.3 Personal Property Taxes ......... 57
10.4 Property Tax Proration ......... 57
11. UTILITIES ......... 57
12. TENANT'S PRO RATA SHARE OF COMMON AREA OPERATING EXPENSES, INSURANCE AND TAXES ......... 60
12.1 General Definitions ......... 60
12.2 Definition of Tenant's Pro Rata Share ......... 61
12.3 Tenant's Payment ......... 61
12.4 Reconciliation ......... 63
12.5 Exclusions from Operating Expenses ......... 64
12.6 Records ......... 67
12.7 Dispute Resolution ......... 67
13. ASSIGNMENT AND SUBLETTING ......... 68
14. DEFAULTS; REMEDIES: ......... 70
14.1 Tenant's Default ......... 70
14.2 Remedies in Default ......... 71
14.3 Landlord Defaults and Remedies ......... 73
15. CONDEMNATION ......... 75
15.1 Condemnation of Premises ......... 75
15.2 Condemnation of the Property ......... 76
15.3 Condemnation of the Building ......... 76
15.4 Restoration ......... 77
15.5 Award ......... 78
16. SIGNAGE ......... 78
17. PERMIT CONTINGENCY ......... 82
18. OUTDOOR SEATING ......... 84
19. TENANT'S RIGHT OF EARLY TERMINATION ......... 85
20. TENANT'S USE OF COMMON AREAS ......... 85
21. PARKING AND ACCESS ......... 86
22. TRASH REMOVAL ......... 87
23. GENERAL PROVISIONS: ......... 87
23.1 Estoppel Certificate ......... 89
23.2 Landlord's Interests ......... 90
23.3 Authority ......... 92
23.4 Severability ......... 92
23.5 Time of Essence ......... 92
23.6 Interpretation ......... 93
23.7 Incorporation of Prior Agreements; Amendments ......... 93
23.8 Waivers ......... 94
23.9 Recording ......... 94
23.10 Holding Over ......... 95
23.11 Cumulative Remedies ......... 95
23.12 Binding Effect; Choice of Law ......... 95
23.13 Subordination; Nondisturbance and Attornment ......... 96
23.14 Landlord's Access ......... 97
23.15 Only Landlord/Tenant Relationship ......... 98
23.16 Attorneys' Fees ......... 99
23.17 Force Majeure ......... 99
23.18 Confidentiality of Lease ......... 101
23.19 Brokers ......... 103

STARBUCKS

Contents

23.20   Waiver of Jury Trial ........................................ 104
23.21   Other Stores .................................................... 104
23.22   .......................................................................... 104
24.   QUIET ENJOYMENT ........................................... 104
25.   NOTICES ............................................................... 105
26.   EXHIBITS ............................................................... 106
........................................................................................ 108

STARBUCKS

COMMERCIAL LEASE
(Freestanding Building w/Drive-Through)

THIS COMMERCIAL LEASE (the "Lease"), is made and entered into as of _Septembr_ 24th, 2007, by and between CTK, LLC, a Kansas limited liability company, ("Landlord") and Starbucks Corporation, a Washington corporation ("Tenant").

1.    PREMISES.

1.1    PREMISES.  Landlord is the owner of that certain real property located at the Northeast corner of President Street and Roosevelt Road (the "Property") legally described in Exhibit A attached hereto and by this reference incorporated herein (the "Property") upon which it shall construct, per Tenant's plans to be provided in the time and manner prescribed herein, a building containing approximately one thousand seven hundred fifty (1,750) square feet of Gross Leasable Area (as defined below) (the "Building"). In consideration of the mutual promises, covenants and conditions herein set forth, Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, for the Term of this Lease all of the premises in the Building as shown by cross-hatching on Exhibit B attached hereto and by this reference incorporated herein (the "Premises").  In addition, Tenant shall have the right to operate a drive-through facility containing one (1) drive-through lane as shown on Exhibit B-1.  For purposes of this Lease, "Gross Leasable Area" means the number of gross square feet of leasable floor area (regardless of whether such area is occupied or enclosed) intended primarily for the exclusive use by an occupant for any length of time, including without limitation garden centers used for the sale and display of merchandise and storage space within or immediately adjacent to an occupant's premises, but excluding any Shopping Center management office, Common Area (as defined in Section 12.1 below) maintenance storage areas, and Common Area community room.  The Gross Leasable Area of any premises (including the Premises) shall be measured from the exterior face of exterior walls and the exterior face of service corridor walls, the line along the front of the such premises where it abuts the sidewalk or other Common Area (which line is commonly known as the "lease line").

2.    TERM.

2.1    TERM.  The "Initial Term" shall mean ten (10) Lease Years, commencing on the Rent Commencement Date (as defined in Section 3.1 below), and ending on the last day of the tenth (10th) Lease Year, unless sooner terminated or extended as provided herein.  For purposes of this Lease, the word "Term" shall mean the Initial Term and any Extension Term (as defined in Section 2.4.1 below) and the "Expiration Date" shall mean the last day of the last Lease Year of the Term.  Promptly after the Rent Commencement Date, Landlord and Tenant shall execute a certificate in the form of Exhibit F stating the actual Commencement Date (as defined in Section 2.2 below), Rent Commencement Date and Expiration Date.  Landlord's failure or refusal to execute and deliver such certificate to Tenant within thirty (30) days after receipt thereof shall constitute an acknowledgment by Landlord that the factual statements contained therein are true and correct without exception, and may be relied upon by Tenant.

2.2    DELIVERY.  The "Commencement Date" shall mean the date on which all of the following conditions have been satisfied or waived by Tenant in writing:

(a)    Landlord has completed Landlord's Work (as defined in Section 4.2);

(b)    Landlord has delivered actual possession and control of the Premises to

STARBUCKS™ 2007

(c)    Landlord and Tenant have executed and delivered a written notice of delivery and acceptance of the Premises in the form attached hereto as **Exhibit D**;

(d)    Tenant has received all Government Approvals (as defined in Section 17 below);

(e)    Landlord has delivered a fully executed copy of this Lease to Tenant;

Notwithstanding the foregoing, in no event shall the Commencement Date occur prior to May 1, 2008 (the "Scheduled Delivery Date"). In the event Landlord desires to deliver possession of the Premises with Landlord's Work completed prior to the Schedule Delivery Date, and the expiration of such time period (IF at least ninety (90) days prior written notice of such revised date, and the expiration of such time period (IF at least ninety (90) days) shall be deemed to be the revised Schedule Delivery Date; provided that (i) Landlord and Tenant have executed and delivered a written notice of delivery and acceptance of the Premises in the form attached hereto as **Exhibit D** and (ii) Tenant has received all Government Approvals (as defined in Section 17 below) by such revised Schedule Delivery Date.

2.3    **LEASE YEAR.** For the purpose of this Lease, subject to the two additional provisions set forth below in this Section 2.3, the term "Lease Year" shall mean and refer to that period of twelve (12) full consecutive calendar months beginning with the first full calendar month of the Term and each subsequent period of twelve (12) consecutive calendar months during the Term. If the Term and commences on a day other than the first day of a calendar month, then the initial fractional month of the Term plus the next succeeding twelve (12) full calendar months shall constitute the first Lease Year of the Term. If the last day of the first Lease Year falls between September 1 and January 31, then the first Lease Year shall be extended to end on the last day in February and each subsequent Lease Year shall begin on March 1.

2.4    **EXTENSION**

2.4.1    Tenant shall have the option to extend the Term of this Lease for four (4) consecutive five (5) year periods (each an "Extension Term"), upon the same terms and conditions as contained in this Lease. The Base Rent for each Extension Term shall be as set forth in Article 3 below. To exercise an extension option, Tenant shall give Landlord notice ("Tenant's Extension Notice") at least ninety (90) days prior to the then-current Expiration Date ("Tenant's Extension Deadline"). Tenant's Extension Notice shall be effective to extend the Term of this Lease without further documentation except as expressly provided in Section 2.4.2 below.

2.4.2    At any time after Tenant has exercised its option to extend the Term of this Lease, Landlord and Tenant, upon request of either, will sign, acknowledge and deliver a written memorandum evidencing Tenant's exercise of the option and setting the date to which such Extension Term will extend and the rental rates that will be applicable during such Extension Term.

3.    **RENT.**

3.1    **BASE RENT.** Tenant shall pay to Landlord at the address stated herein, or to such other person or at such other place as Landlord may designate in writing, rent as follows ("Base Rent"):

| Lease Years | $ Per Square Foot Per Year | Monthly Installments | Annual Rent |
|---|---|---|---|
| 1 - 5 | $48.00 | $7,000.00 | $84,000.00 |

2

STARBUCKS™ 2003

| | | | |
|---|---|---|---|
| 6 - 10 | $52.80 | $7,700.00 | $92,400.00 |
| Extension Terms | | | |
| 11 - 15 | $58.08 | $8,470.00 | $101,640.00 |
| 16 - 20 | $63.08 | $9,317.29 | $111,807.50 |
| 21 - 25 | $70.28 | $10,249.17 | $122,990.00 |
| 26 - 30 | $77.31 | $11,274.38 | $135,292.50 |

Tenant shall commence to pay Base Rent and all other charges hereunder on the date (the "Rent Commencement Date") that is ninety (90) days after the Commencement Date and shall continue to pay Base Rent in monthly installments on or before the first day of every month thereafter during the Term. Rent for any period during the Term less than one calendar month shall be prorated on a daily basis based on a three hundred sixty-five (365) day year. Notwithstanding the foregoing, Tenant shall not be required to pay Base Rent or any other charges hereunder until Tenant receives from Landlord a completed and executed W-9 taxpayer identification form and a copy of Landlord's most recent tax bill for the Property. Other than paying Base Rent and the other charges expressly provided elsewhere in this Lease, Tenant has no obligation to pay Landlord any other amounts.

4.     CONDITION OF THE PREMISES, POSSESSION AND TENANT ALLOWANCE.

4.1     CONDITION OF THE PREMISES.  Landlord shall cause the Property, including the Premises, Building, drive-through lanes and parking spaces, to be designed and constructed substantially as shown on Exhibits B, B-1 and B-2.  Landlord represents and warrants that, as of the Commencement Date, Landlord's Work, the Common Area and all parts of the Premises and the Building (including, without limitation, sidewalks, parking areas, driveways, all structural elements, the foundation, roof, roof membrane and roof system, exterior walls, plumbing, electrical and other mechanical systems (a) shall be complete and comply with all federal, state, and local laws, codes, rules and regulations including, without limitation, all handicapped accessibility standards, such as those promulgated under the Americans With Disabilities Act ("ADA"), and (b) shall be, to the best of Landlord's knowledge, structurally sound and in good, workable and sanitary order, condition, and repair at the time of delivery of the Premises to Tenant.  Landlord shall correct any latent defects unrelated to the acts or omissions of Tenant promptly after Tenant notifies Landlord of any such defect.  Landlord represents and warrants that, to the best of its knowledge, it has disclosed to Tenant any conditions or restrictions, including, without limitation, environmental contamination, restrictions on utilities or exclusive use restrictions within Landlord's knowledge that would adversely affect Tenant's store design, permitting, construction or use as contemplated by this Lease.

4.2     LANDLORD'S OBLIGATIONS.  At no cost to Tenant, Landlord shall provide to Tenant a copy of the final plans of the Premises and Building that were approved by all applicable government entities in an industry standard electronic or digital format. Landlord shall complete all items described on Exhibit C attached hereto and by this reference incorporated herein, and any work necessary to bring the Premises and the Building into the condition required under Section 4.1 (collectively, "Landlord's Work") at its sole cost and expenses in a good and workmanlike manner before delivering the Premises to Tenant.  Landlord's Work shall also include obtaining all permits and/or government approvals necessary for the construction and operation of Tenant's drive-through facility as described on Exhibit B and Exhibit C.  Landlord shall notify Tenant in writing at least ten (10) days prior to the date that Landlord anticipates that the Premises will be ready for Tenant's occupancy and Tenant shall arrange promptly to jointly inspect the Premises with Landlord.  At the time of Tenant's inspection, Landlord shall demonstrate all of Landlord's Work, including (without limitation) the matters identified in Section 4.1, such as the legal compliance, working order, condition and repair of all mechanical, electrical and other Building-wide systems serving the Premises.  At the time of Tenant's inspection, Tenant shall deliver to

3

STARBUCKS™ 2007

Landlord a written punch list (in the form attached hereto as Exhibit D) of all incomplete or faulty items needed to bring Landlord's Work in the Premises into the condition required under this Article.

If the Premises are in the condition required under this Article on the Scheduled Delivery Date but subject only to minor punch list items, Tenant may, at its option, (i) require Landlord to repair all punch list items prior to Tenant's acceptance of the Premises, or (ii) accept delivery of the Premises and require Landlord to complete the punch list items within twenty-one (21) days after the date Tenant takes possession of the Premises. If the Premises are not in the condition required under this Article on the Scheduled Delivery Date then Tenant may, at its option, either (a) delay acceptance of possession of the Premises until the Premises are in the condition required under this Article and pursue its remedies under Section 4.3; or (b) accept possession of the Premises and complete all work necessary to bring the Premises into the required condition. Tenant shall provide Landlord with notice of intention to exercise either option, and shall not exercise either option if Landlord cures the condition within ten (10) days of receipt of such notice. If Tenant elects to proceed under the foregoing subsection (b), Tenant may enter the Premises to begin repairing Landlord's Work (all expenses) without prejudicing Tenant's rights and remedies under Section 4.3. If Tenant elects to proceed under the foregoing subsection (b), then Landlord shall reimburse Tenant for the actual cost of such work and any additional amounts Landlord agreed to pay Tenant pursuant to other written agreements such as the Landlord Work Modification Letter attached hereto as Exhibit E, plus an administrative surcharge of fifteen percent (15%) to compensate Tenant for its employees' time, within thirty (30) days of receipt of an invoice for such sums. If Landlord does not reimburse Tenant as required by this Section, then Tenant may offset such sum against Base Rent and all other charges until such sum has been fully recouped.

4.3    DELAY IN DELIVERY OF POSSESSION. Landlord shall satisfy all conditions listed in Section 2.2 (a) through (e) above on or before the Scheduled Delivery Date. Landlord acknowledges that Tenant intends to start construction of Tenant's improvements on the Scheduled Delivery Date, and that a delay beyond such date will cause Tenant to suffer certain losses which are difficult to quantify including, by way of illustration and not of limitation, lost profits, construction delay costs and employees' wages. If the Commencement Date does not occur within fourteen (14) days of the Scheduled Delivery Date for any reason (regardless of fact that Tenant may have elected to enter the Premises to perform Tenant's Work prior to Landlord's Work being completed), then Landlord shall pay to Tenant, as liquidated damages and not as a penalty, the sum of Two Hundred Fifty Dollars ($250.00) per day accruing from the Scheduled Delivery Date to the actual Commencement Date; provided, however, that if such delay is caused by a Force Majeure Event (as defined in Section 23.17 below), the Scheduled Delivery Date shall be deemed extended by a period during which said Force Majeure Event shall cause such delay, but such deferral of the Scheduled Delivery Date shall in no event be deferred by a Force Majeure Event for more than forty-five (45) days. Landlord and Tenant agree that the foregoing sum is their best estimate of the daily damages, including but not limited to lost sales that Tenant will incur as a result of Landlord's failure to deliver the Premises. If Landlord fails to pay such liquidated damages by the Rent Commencement Date, Tenant shall be entitled to offset such sums against Base Rent and, at its option, Annual Additional Rent until fully recouped. If the Commencement Date does not occur within one hundred eighty (180) days after the Scheduled Delivery Date for any reason whatsoever, Tenant, at its option, may terminate this Lease upon written notice to Landlord. Such termination shall not be subject to extension for any reason whatsoever (including, without limitation, Section 23.17). If Tenant elects to terminate this Lease, in addition to liquidated damages due for the period of delay, Landlord shall reimburse Tenant for all of Tenant's expenses incurred in connection with this Lease, including, without limitation, site selection and lease negotiation costs and expenses (including the allocated cost of in-house personnel) in an amount not to exceed Fifty Thousand Dollars ($50,000). Landlord shall also return all monies previously deposited by Tenant, if any.

STARBUCKS X2000

4.4 **TENANT ALLOWANCE.** In addition to Landlord's obligations under Sections 4.1 and 4.2 above, Landlord shall provide Tenant with an improvement allowance in the amount of Twenty Five Dollars ($25.00) per square foot of Gross Leasable Area in the Premises (the "Allowance") which shall be paid in full to Tenant upon Tenant's opening for business in the Premises. The Allowance shall not be reduced by costs incurred by Landlord in constructing the Premises or the Building and can be modified by only an amendment to this Lease that has been duly executed by Landlord and Tenant. Landlord and Tenant agree that the Allowance offsets the cost of the flooring, ceiling, electrical, sewer, and bathroom Tenant must install, all of which, upon installation, shall become the property of Landlord and remain in the Premises. If Landlord has not paid Tenant the Allowance within thirty (30) days after Tenant opens for business in the Premises, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount and a One Hundred Dollar ($100.00) per month administrative fee, against Base Rent and all other charges (at Tenant's discretion) until the Allowance is fully offset.

4.5 **INDEPENDENT MEASUREMENT OF PREMISES.** At any time during the first thirty (30) days of the Term, Tenant may engage an independent certified architect or surveyor to measure the Gross Leasable Area of the Premises. If the architect or surveyor's measurement of the Gross Leasable Area of the Premises is less than the Gross Leasable Area of the Premises set forth in Section 1 above by five percent (5%) or more, the Allowance, Base Rent and Tenant's Pro Rata Share (as defined in Section 12.2 below) shall be proportionally reduced. If the variance is less than five percent (5%), Landlord and Tenant shall make no adjustments to this Lease.

4.6 **LANDLORD'S BUILDING PLANS.** Tenant shall have the right to approve Landlord's plans for configuration of the Premises, Tenant's drive-through facility, and the parking area ("Landlord's Plans") prior to Landlord's submission of Landlord's Plans for permitting. Landlord and Tenant shall work together and cooperate with each other in preparing and reviewing the plans and specifications. Landlord shall obtain its permits for Landlord's Plans on or before March 1, 2008. If Landlord materially changed Landlord's Plans after Tenant approves the same (whether or not the changes are being required by a governing authority), then Landlord shall re-submit Landlord's Plans clearly indicating the changes ("Landlord's New Plans") to Tenant for Tenant's review and approval. Tenant shall either approve Landlord's New Plans or request modifications to Landlord's New Plans. Landlord and Tenant shall work together and cooperate with each other in preparing and reviewing Landlord's New Plans. Landlord shall reimburse Tenant for the actual cost for Tenant to redraw its plans for the Premises ("Re-draw Costs") to correspond with Landlord's New Plans. If Tenant does not approve Landlord's New Plans, Tenant may terminate this Lease by giving written notice to Landlord. If Tenant does not terminate this Lease and Landlord has not paid Tenant its Re-Draw Costs within thirty (30) days after Tenant opens for business in the Premises, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the Re-Draw Costs are fully offset.

5. **USE.**

5.1 **USE.** Tenant may use and occupy the Premises and drive-through lane for (1) a coffee shop including, at Tenant's discretion, the retail sale of (a) whole and ground coffee beans; (b) coffee by the cup; (c) espresso/coffee/tea-based drinks; (d) teas and spices; (e) blended beverages; (f) espresso/coffee/tea related equipment, supplies and accessories; (g) seasonal, promotional and Tenant branded merchandise; (h) assorted food items including but not limited to baked goods, desserts, salads, sandwiches, juices, candies and novelties; (i) books, magazines and newspapers; (j) music merchandise and digital media content; and (k) any other items that Tenant makes available for sale in the ordinary course of business or (2) any other lawful retail or restaurant use not in violation of the Use and Operating

»STARBUCKS '1'2007

C:\Documents and Settings\bpd\Local Settings\Temporary Internet Files\OLK22\Lease 09.doc

restrictions set forth Exhibit G attached hereto and by this reference incorporated herein (the "Use Restrictions"). Landlord represents and warrants that Tenant's right to operate a coffee shop selling the items referenced in Section 5.1 (i)(a) through (j) above does not violate the terms and conditions of the Use Restrictions.

5.2    COMPLIANCE WITH LAW.    During the Term, Tenant, at its expense, shall comply promptly with all laws, rules, and regulations made by any governmental authority having jurisdiction over Tenant's use of the Premises pertaining to (a) the physical condition of any improvement constructed by Tenant in the Premises; and (b) Tenant's specific business operations in the Premises.  Tenant shall not be required to make any seismic or structural upgrades, repairs, improvements or alterations to the Premises or the Building in order to comply with the requirements of this Section.  Landlord, at its sole cost and expense, shall comply with all other laws, rules, regulations, and ordinances made by any governmental authority affecting the Premises, areas adjacent to the Premises, the Common Areas, the Building and/or the Property including, without limitation, all accessibility for the disabled requirements.

5.3    OPERATIONS.    Tenant may operate its business in such manner and at such hours as Tenant considers proper in Tenant's business judgment.  It is expressly understood and agreed that Tenant makes no representations or warranties, oral or written, as to the level of gross sales it may generate from the Premises or the number of customers that it will bring to the Building.

5.4    EXCLUSIVITY.    Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of (a) whole or ground coffee beans; (b) espresso, espresso-based drinks or coffee-based drinks; (c) tea or tea-based drinks; (d) brewed coffee; or (e) blended beverages including, without limitation, those containing any of the following: ice, coffee, espresso, tea, milk, cream, juice and/or fruit.

6.    MAINTENANCE, REPAIRS, AND ALTERATIONS.

6.1    TENANT'S OBLIGATIONS.    Subject to the provisions of Sections 6.2, 6.3, 9, and 15, whether or not insured or insurable, Tenant, at Tenant's expense, shall keep the Premises in good order and repair, including maintaining all plumbing, HVAC, electrical and lighting facilities and equipment within the Premises and exclusively serving the Premises, and the store front, doors, and plate glass of the Premises.  At Tenant's request and to the extent transferable, Landlord shall transfer or assign to Tenant all warranties, express or implied, under any contract or subcontracts relating to any improvements or equipment Landlord built or installed within the Premises to serve the Premises exclusively, including, without limitation, the warranty for the HVAC system.  Notwithstanding any provision to the contrary, Tenant's obligations under this Section shall not include making (a) any repair or improvement necessitated by the negligence or willful misconduct of Landlord, its agents, employees or servants to the extent such repairs are not covered by insurance Tenant maintains or is required to maintain in accordance with the terms of this Lease; (b) any repair or improvement caused by Landlord's failure to perform its obligation hereunder or under any other agreement between Landlord and Tenant; or (a) any structural or seismic repairs to the Premises or the Building.

6.2    LANDLORD'S OBLIGATIONS.    Except for repairs, maintenance and replacements to the Premises and the Building for which Tenant is responsible under Section 6.1, Landlord shall maintain, repair and make replacements to the Premises and the Building (including the Common Areas).  Landlord shall, at its sole cost and expense (subject to Tenant's payment obligations, if any, pursuant to Section 12 below), make the repairs and replacements and perform such work that is necessary to maintain the foregoing Building in a condition comparable to other first-class retail buildings in the Wheaton, Illinois metropolitan area.  Such repairs, replacements and maintenance shall include

6

**STARBUCKS** *K2007*

(without limitation) (a) the upkeep of the roof, roof membrane and roof systems (gutters, downspouts and the like), foundation, exterior walls, interior structural walls, and all structural components of the Premises and (b) the maintenance and repair of all parking areas, sidewalks, landscaping and drainage systems on the Property and all utility systems (including mechanical, electrical, and HVAC systems) and plumbing systems which serve the Building. Landlord shall not be required to maintain the interior surface of exterior walls, windows, doors or plate glass and store fronts (except where maintenance of the same is caused by Landlord's negligence or failure to perform its obligations under this Section).

Landlord shall make all repairs under this Section promptly after Landlord learns of the need for such repairs but in any event within thirty (30) days after Tenant notifies Landlord of the need for such repairs. If Landlord fails to make such repairs within thirty (30) days after Tenant's written notice (except when the repairs require more than thirty (30) days for performance and Landlord commences the repair within thirty (30) days and diligently pursues the repair to completion), Tenant may, at its option, undertake such repairs and deduct the cost thereof from the installments of Base Rent and Monthly Estimated Rent next falling due. Notwithstanding the foregoing, in the event of an emergency, Tenant may give Landlord such shorter notice as is practicable under the circumstances, and if Landlord fails to make such repairs immediately after being notified by Tenant, Tenant may immediately undertake such repairs and deduct the cost thereof from the installments of Base Rent and all other charges next falling due.

6.3    SURRENDER. Upon the expiration or termination of this Lease, Tenant shall surrender the Premises to Landlord in broom clean condition, except for ordinary wear and tear and damage caused by fire or other casualty, whether or not insured or insurable.

6.4    LANDLORD'S RIGHTS. If Tenant fails to perform Tenant's obligations under this Article, Landlord may, but shall not be required to, enter upon the Premises, after thirty (30) days prior written notice to Tenant, and put the same in good order, condition and repair, and the reasonable costs thereof shall become due and payable as additional rental to Landlord together with Tenant's next Base Rent installment falling due after Tenant's receipt of an invoice for such costs. Notwithstanding the foregoing, Landlord's rights under this Section shall be subject to Section 23.14.

6.5    ALTERATIONS AND ADDITIONS.

6.5.1    Initial Improvements. Tenant, at Tenant's cost, may install such fixtures and finishes and other initial tenant improvements in the Premises as Tenant deems necessary or desirable for the conduct of Tenant's business therein (the "Initial Improvements"). Tenant shall submit the plans and specifications (the "Plans") for the Initial Improvements to Landlord for Landlord's review and approval of the structural elements. Landlord shall have a period of fourteen (14) days (the "Review Period") to review the Plans. Landlord shall not be deemed to have approved the Plans as presented unless, on or before the last day of the Review Period, Landlord has delivered to Tenant a written description of the specific structural items in the Plans that are not acceptable and a description of the specific changes that must be made to the Plans to secure Landlord's approval. Tenant shall either (i) submit modified plans for approval, or (ii) terminate this Lease if Landlord's requested revisions are not acceptable to Tenant in its sole discretion. The review and approval process described above shall continue until such time as Landlord has approved the Plans in writing (the "Final Plans") or until this Lease is terminated.

6.5.2    Subsequent Improvements. After the installation of the Initial Improvements, Tenant may make such interior non-structural alterations, improvements and additions to the Premises including, without limitation, changing color schemes, installing new countertops, flooring, wall-covering and modifying the layout of the tenant fixtures, as Tenant deems necessary or desirable without obtaining Landlord's consent. Notwithstanding the foregoing, Tenant shall not make any alterations, improvements, addition or repairs in, on, or about the Premises which affect the structure or

7

STARBUCKS COFFEE COMPANY

the mechanical systems of the Building without Landlord's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. Landlord shall be deemed to have approved any subsequent improvement proposed by Tenant unless Landlord disapproves of Tenant's proposal in writing within fourteen (14) days of receiving Tenant's proposal and request for consent.

6.5.3   Liens. Before commencing any alterations, additions or improvements using outside contractors, Tenant shall notify Landlord of the expected commencement and completion dates of the work. Tenant shall not permit any mechanic's or materialmen's liens to be levied against the Premises for any labor or material furnished to Tenant or to its agents or contractors; provided, however, that Tenant shall not be required to pay or otherwise satisfy any claims or discharge such liens so long as Tenant, within ten (10) business days following written demand from Landlord at its own expense, contests the same or the validity thereof by appropriate proceedings and posts a bond or takes other steps acceptable to Landlord that remove such lien or stay enforcement thereof.

6.6   OWNERSHIP AND REMOVAL OF IMPROVEMENTS, FIXTURES, EQUIPMENT AND FURNISHINGS.

6.6.1   The term "Tenant's Property" shall mean all personal property, furnishings, machinery, trade fixtures, equipment and improvements (trade or otherwise) which Tenant installs in the Premises. Until or upon the termination or expiration of the Term, Tenant may remove Tenant's Property from the Premises no later than the termination or expiration date. In addition, Tenant may remove from the Premises all items (other than those items installed by Tenant that are indicative of Tenant's business and may otherwise "de-identify" the Premises, as Tenant reasonably believes necessary or appropriate for the protection of Tenant's interest in Tenant's trademarks, trade names or copyrights. Tenant shall repair any damage to the Premises or the Building caused by such removal, including patching and filling holes. Notwithstanding the foregoing, in no event shall Tenant be entitled pursuant to this Section 6.6.1 to remove, nor shall Tenant be required to remove, any restroom fixtures, flooring, ceilings, walls or utility or electrical components located inside the walls or HVAC systems.

6.6.2   Any of Tenant's Property not removed from the Premises on the date this Lease terminates or expires shall be deemed abandoned and shall thereupon become the property of Landlord.

7.   INSURANCE; INDEMNITY.

7.1   TENANT'S INSURANCE. During the Term of this Lease, Tenant shall obtain and keep in full force and effect, the following insurance which may be provided under blanket insurance policies covering other properties as well as the Premises and shall be maintained with an insurance company with an A.M. Best Company ("Best's") rating of at least A- and a Best's financial performance rating of at least VII. Upon Landlord's request, Tenant will provide Landlord with a certificate(s) evidencing such insurance, or will provide access to an internet website that will provide Landlord with substantially similar information. As of the date of this Lease, the current address of the internet website is www.marsh.com/msn?client=2061.

7.1.1   Liability Insurance. Bodily injury, personal injury and property damage insurance, naming Landlord, as well as Landlord's managing agent upon Landlord's written request, as additional insured, against liability arising out of Tenant's use, occupancy, or maintenance of the Premises and Tenant's outdoor seating area (if any). Such insurance shall include an "each occurrence" limit of not less than One Million Dollars ($1,000,000) and a general aggregate limit of not less than Two Million Dollars ($2,000,000). Tenant's insurance shall be primary with respect to any claim arising out of events that occur in the Premises.

C:\Documents and Settings\kjallen\Local Settings\Temporary Internet Files\OLK3F\state.01.doc

STARBUCKS ©2007

7.1.2    Property Insurance. Commercial property form insurance with a special form endorsement providing coverage on a replacement cost basis for Tenant's trade fixtures, equipment and inventory in the Premises. During the Term, Tenant shall use the proceeds from any such policy or policies of insurance for the repair or replacement of the insured property unless Tenant elects to terminate this Lease pursuant to Article 9 hereof. Landlord shall sign all documents which are necessary or appropriate in connection with the settlement of any claim or loss by Tenant. Tenant's proceeds Tenant receives for Tenant's Property and Landlord shall have no interest in any insurance policies shall not be contributing with or in excess of any coverage which Landlord shall carry on the Building.

7.2    LANDLORD'S INSURANCE. During the Term of this Lease, Landlord shall obtain and keep in full force and effect, the following insurance from an insurance company with a Best's rating of at least A- and a Best's financial performance rating of at least VII. The insurance required to be carried by Landlord under this Section shall be referred to herein as "Landlord's Insurance." Tenant shall be named as additional insured under Landlord's liability insurance policies and an additional loss payee (to the extent of its interest, as it may appear from time to time) under Landlord's property insurance policies. Upon Tenant's request, Landlord will provide Tenant with a copy of the certificate(s) evidencing and premium bill for Landlord's Insurance.

7.2.1    Liability Insurance. Bodily injury, personal injury and property damage insurance (to include without limitation contractual liability covering Landlord's obligations under Section 7.5) insuring against claims of bodily injury or death, personal injury or property damage arising out of or in connection with (a) Landlord's conduct upon, in or about the Premises; or (b) the use or occupancy of the Building, including (without limitation) the Common Areas, if any with an each occurrence limit of not less than One Million Dollars ($1,000,000) and a general aggregate limit of not less than Two Million Dollars ($2,000,000). Notwithstanding the foregoing, Landlord's Insurance shall be primary with respect to any claim covered by Section 7.1(a) or arising out of events that occur outside the Premises.

7.2.2    Property Insurance. Special Form commercial property insurance insuring the Building (excluding any property which Tenant is obligated to insure under Section 7.1), for the amount of the full replacement of its value as such value may exist from time to time.

7.3    WAIVER OF SUBROGATION. Notwithstanding any other provisions of this Lease to the contrary, neither Landlord nor Tenant shall be liable to the other or to any insurance company (by way of subrogation or otherwise) insuring the other party for any loss or damage to any building, structure or other tangible property, or any resulting loss of income and benefits, even though such loss or damage might have been occasioned by the negligence of such party, its agents or employees if any such loss or damage is covered by insurance benefiting the party suffering such loss or damage or was required to be covered by insurance pursuant to this Lease. Landlord and Tenant shall require their respective insurance companies to include a waiver of subrogation provision in their respective policies in order to implement this Section 7.3.

7.4    INDEMNIFICATION BY TENANT. Subject to Section 7.3 and provided that Landlord notified Tenant in writing of any such third party claims within five (5) days after Landlord becomes aware of such claim, Tenant shall defend, protect, indemnify, and hold Landlord and Landlord's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) arising in connection with any and all third party claims arising out of (a) injuries occurring within the Premises; (b) any intentional conduct or negligence of Tenant or Tenant's agents, employees, or contractors; (c) any breach or default in the performance of

C:\Documents and Settings\kgchase\Local Settings\Temporary Internet Files\OLK2B\Lease58.doc

®STARBUCKS™2007

any obligation on Tenant's part to be performed under this Lease; or (d) the failure of any representation or warranty made by Tenant herein to be true when made. This indemnity does not include the intentional or negligent acts or omissions of Landlord or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease. Notwithstanding any provision of this Lease to the contrary, the provisions of this Section 7.4 and Tenant's covenant to provide insurance as provided in this Lease shall in no event extend to Landlord's independent liability.

7.5   INDEMNIFICATION BY LANDLORD. Subject to Section 7.3, Landlord shall defend, protect, indemnify, and hold Tenant and Tenant's agents, officers, directors, employees, and contractors harmless against and from any and all injuries, costs, expenses, liabilities, losses, damages, injunctions, suits, actions, fines, penalties, and demands of any kind or nature (including reasonable attorneys' fees) by or on behalf of any person, entity, or governmental authority occasioned by or arising out of (a) injuries occurring in the Common Areas or any other portion of the Building outside the Premises, (b) any intentional conduct or negligence of Landlord or Landlord's agents, employees, or independent contractors, (c) any breach or default in the performance of any obligation on Landlord's part to be performed under this Lease, or (d) the failure of any representation or warranty made by Landlord herein to be true when made. This indemnity does not include the intentional or negligent acts or omissions of Tenant or its agents, officers, contractors or employees. This indemnity shall survive termination of this Lease only as to claims arising out of events that occur prior to termination of this Lease.

8.   ENVIRONMENTAL LIABILITY.

8.1   ENVIRONMENTAL LAW. The term "Environmental Law" means any federal, state, local law, statute, ordinance, regulation or order and all amendments thereto pertaining to health, industrial hygiene, environmental conditions or Hazardous Substances.

8.2   HAZARDOUS SUBSTANCE. The term "Hazardous Substance" shall mean any substance that is actually or allegedly harmful to human life, animal life, or vegetation or any other portion of the environment; toxic substances, wastes, or pollutants; and hazardous or dangerous substances, including any substance defined, listed and/or regulated by any Environmental Law or by common law decision including, without limitation, chlorinated solvents, petroleum products or by-products, asbestos, and polychlorinated biphenyl).

8.3   LANDLORD'S COVENANTS. Landlord warrants, represents, covenants and agrees as follows:

8.3.1   To the best of Landlord's knowledge (other than as disclosed in the Environmental Reports (as defined herein)), no Hazardous Substance has been released, discharged or disposed of on, under or about the Premises, the Building or the Property (or off-site of the Property which might affect the Premises, the Building or the Property) by any entity or person, or from any source whatsoever. Without limiting the foregoing, Landlord represents that the following conditions all currently exist: in Landlord's possession or control concerning any release of Hazardous Substances on, under or about the Premises, the Building or the Property (or off-site of the Premises that might affect the Premises, or off-site of the Property that might affect the Premises or the Building) including, without limitation, sampling data, environmental studies or reports, environmental site assessments, building surveys, and historical use reviews (collectively, "Environmental Report"), all of which have been provided to Tenant and are set forth in Exhibit H attached hereto and by this reference incorporated herein.

STARBUCKS ®

8.3.2    Landlord shall require each of its employees, agents, contractors, subcontractors, tenants, subtenants, or any other party over whom Landlord has supervision or control or right of the same to comply with all applicable Environmental Laws.

8.3.3    Without limiting the foregoing and to the best of Landlord's knowledge, other than as disclosed to Tenant in the Environmental Reports, (a) there are no underground storage tanks on the Premises, the Building or the Property, (b) no underground storage tanks have been removed from the Premises, the Building or the Property, (c) there is no asbestos or asbestos-containing material in or on the Premises or the Building and no asbestos or asbestos-containing material has been removed from the Premises or the Building, (d) no facilities involving the manufacture or disposal of any Hazardous Substance or the use or storage of more than five hundred (500) gallons of any Hazardous Substance per year, including, without limitation, gasoline stations, automobile repair facilities, dry cleaners, photo developing laboratories, junkyards, landfills, waste treatment storage, disposal, processing or recycling facilities have been located on or adjacent to the Premises, the Building or the Property.

8.3.4    Landlord shall give prompt written notice to Tenant of: (x) any proceeding or inquiry by any governmental authority with respect to the presence of any Hazardous Substance on the Premises or the Building (or off-site of the Premises that might affect the Premises) or related to any loss or injury that might result from any Hazardous Substance, (b) all claims made or threatened by any third party against Landlord or the Premises, the Building or the Property relating to any loss or injury resulting from any Hazardous Substance; and (c) Landlord's discovery of any occurrence or condition on the Premises, the Building or the Property (or off-site of the Premises that might affect the Premises) that could cause the Premises or the Common Areas, if any, or any part of either, to be subject to any restriction on occupancy or use of the Premises under any Environmental Law.

8.3.5    Subject to Tenant's obligations set forth in Section 8.5.1, if any Hazardous Substance is deposited, released, stored, disposed, discovered or present in or on the Premises, the Building or the Property, Landlord, at Landlord's expense, shall promptly and diligently, to the extent required by any applicable law, including (without limitation) any Environmental Laws, rules, regulations and policies of any governmental entity with jurisdiction over the same, and in compliance with such laws, remove, transport and dispose of such Hazardous Substance. Landlord shall use its best efforts to minimize direct and indirect impact on Tenant, including its operations in the Premises and effective use of the Common Areas, if any, during all activities related to remediation. Without limiting the foregoing, prior to the Commencement Date, Landlord shall, at its sole cost and expense, remove all asbestos and asbestos-containing material from the Premises. If any asbestos or asbestos-containing material is discovered in the Premises during Tenant's inspection of the Premises, construction of its initial or subsequent tenant improvements or at any other time during the Term, then Landlord shall promptly remove the same or cause it to be removed at Landlord's sole cost and expense and if the foregoing delays the construction or installation of Tenant's improvements, then the Rent Commencement Date shall be extended for one (1) day for each day of delay. In the event that there shall now or in the future exist any Hazardous Substances in, on, under or about the Premises, the Building or the Property (not caused by Tenant) that materially and adversely affect Tenant's use of or operations from the Premises, access to or visibility of the Premises, Tenant's construction of its improvements or Tenant's use of the Common Areas (collectively "Interference"), then, (i) in such event, Base Rent and all other charges payable under this Lease shall be equitably reduced in proportion to the effect of the Interference on Tenant's operations; (ii) if Tenant, in its sole discretion, decides to cease operating in the Premises, then (x) all Base Rent and all other charges payable under this Lease shall abate until the date on which Tenant is reasonably able to reopen for business from the Premises without any Interference and (b) for each day of closure, Landlord shall pay to Tenant, as liquidated damages and not as a penalty, the sum of Two Hundred Fifty Dollars ($250.00) per diem; (iii) if such Interference occurs prior to the Rent Commencement Date, then the Rent Commencement Date shall be delayed for one (1) day for each day of Interference. (notwithstanding

11

STARBUCKS ®1997

anything in Section 3.1 of this Lease to the contrary), and (v) if such interference continues for more than ninety (90) days, Tenant may terminate this Lease, in which event Landlord shall pay to Tenant within twenty (20) days of the date of Tenant's vacation of the Premises an amount equal to the unamortized portion (based on straight-line amortization over the Initial Term) of Tenant's store development costs incurred in connection with the Premises, including (without limitation) attorneys' fees, design fees, consultant fees (whether for the foregoing fees are incurred by outside or in-house personnel), permitting fees, site selection costs, and construction costs, plus all other costs and expenses incurred by Tenant in connection with this Lease and the Premises.

In addition to Landlord's obligations set forth in this Article 8 and as set forth in the Environmental Reports, Landlord shall with due diligence direct and cooperate with BP Products North America to (i) complete all soil extraction and/or treatment of Hazardous Substances pursuant to the final remediation plan for the Property prior to delivery of possession of the Premises to Tenant, (ii) before commencing any such extraction and/or remediation, obtain Tenant's prior written approval of the final remediation plan for the Property, including the location of all groundwater monitoring and filtration equipment and logistics of periodic testing, (iii) install all groundwater monitoring and filtration equipment prior to delivery of possession of the Premises pursuant to the final remediation plan approved by Tenant, (iv) remediate all recognized environmental conditions identified in the Environmental Reports pursuant to the final remediation plan, (v) as soon as remediation is complete submit all materials and documents (with a copy of such materials and documents to Tenant) required for the applicable governmental agency to issue a No Further Action Letter ("NFA Letter") or substantially similar documentation issued from the applicable governmental agency that provides among other things that no further remediation or monitoring is required at the Property, and (vi) pursue the issuance of the NFA Letter from the applicable governmental authority and provide Tenant with a copy of the NFA Letter upon receipt by Landlord. In the event Landlord fails to obtain the NFA Letter from the applicable governmental authority within two (2) years after Landlord submission of such materials and documents closing out the required remediation, Tenant may terminate this Lease, in which event Landlord shall pay to Tenant within twenty (20) days of the date of Tenant's vacation of the Premises an amount equal to the unamortized portion (based on straight-line amortization over the Initial Term) of Tenant's store development costs incurred in connection with the Premises, including (without limitation) attorneys' fees, design fees, consultant fees (whether for the foregoing fees are incurred by outside or in-house personnel), permitting fees, site selection costs, and construction costs, plus all other costs and expenses incurred by Tenant in connection with this Lease and the Premises.

8.4    TENANT'S USE OF ANY HAZARDOUS SUBSTANCE.    The only Hazardous Substances Tenant may use in its operations are cleaning solutions and other substances as are customarily used in Tenant's business. Tenant will manage such use in accordance with the Environmental Laws.

8.5    INDEMNITIES.

8.5.1    Tenant shall protect, defend, indemnify, and hold harmless Landlord and Landlord's employees, agents, parents, and subsidiaries from and against any and all loss, damage, costs, claims, damage, expense, or liability, including, without limitation, attorneys' or other professional fees, and the costs of repairs and improvements necessary to return the Premises to the physical condition existing prior to undertaking any activity related to any Hazardous Substance ("Claims") actually incurred by Landlord directly arising out of or attributable to Tenant's or Tenant's agents, contractors, or employees use, manufacture, storage, release, or disposal of a Hazardous Substance on the Premises or the Building. This indemnity shall survive the termination of this Lease.

12

© Discussions and Saving Sophia of Lease Saving / Insurance Plan/DLK/03 Lease 08.doc

★STARBUCKS™°°⁰

8.5.2    Landlord shall protect, defend, indemnify and hold harmless Tenant and its agents, officers, directors, contractors, employees, parents, subsidiaries, successors and assigns from and against any Claims actually incurred by Tenant directly arising out of or attributable to: (a) a violation of Environmental Laws, except that if such Claims are directly related to Tenant's, or Tenant's agents, contractors or employees uses, manufacture, storage, release or disposal of a Hazardous Substance on the Premises or the Building; or (b) a material breach of any representation, warranty, covenant or agreement contained in this Article. This indemnity shall survive the termination of this Lease. In the event that any Environmental Law or any remedial or response activity concerning Hazardous Substances in, on, under or about the Premises, the Building or the Property (not caused by Tenant) materially and adversely affects Tenant's operations in the Premises or effective use of any Common Areas, if any, Tenant may cease operating (if Tenant has elected to operate on the Premises) and, in such event, Base Rent and all other charges shall be abated. If such interference shall continue for six (6) months, Tenant may terminate this Lease.

9.    DAMAGE OR DESTRUCTION

9.1    MATERIAL DAMAGE.  If the Premises or the Building is damaged or destroyed by fire or any casualty which cannot, despite diligent, good faith efforts to be repaired or restored within two hundred seventy (270) days following the date on which such damage occurs, then Tenant may elect to terminate this Lease effective as of the date of such damage or destruction. Within thirty (30) days after the date of such damage, the parties shall reasonably determine how long the repair and restoration will take. After that determination has been made, Tenant shall have a period of thirty (30) days to terminate this Lease by giving written notice to Landlord.

9.2    REPAIR AFTER DAMAGE.  If Tenant does not give written notice of Tenant's election to terminate as provided in Section 9.1, then Landlord shall, subject to the provisions of this Section, immediately commence and diligently pursue to completion the repair of such damage so that the Premises and the Building are restored to a condition of sanitary quality, character and utility for Tenant's purposes, including restoration of all items described on Exhibit C existing in the Premises prior to such damage. In the event that there is no Exhibit C to this Lease, Landlord shall restore the Premises and the Building to a condition of similar quality, character and utility for Tenant's purposes existing in the Premises prior to such damage. Notwithstanding anything contained herein to the contrary, if the Premises and the Building are not repaired and restored within two hundred seventy (270) days from the date of the damage, Tenant may terminate the Lease, at any time before Landlord completes the repairs and delivers the restored Premises to Tenant, upon thirty (30) days prior written notice to Landlord; provided, however, in the event Landlord completes the repairs and delivers the restored Premises to Tenant within said thirty (30) day period, Tenant's termination notice shall be deemed null and void. If Tenant does not so terminate, Landlord shall diligently continue to restore the Premises. In the event of termination, Landlord shall return any prepaid Base Rent and other prepaid amounts to Tenant within thirty (30) days from the date of termination of this Lease.

9.3    UNINSURED DAMAGE.  If damage or destruction is caused by a peril not required to be insured against hereunder and for which insurance proceeds are not available, either Landlord or Tenant may terminate this Lease by thirty (30) days written notice to the other of its election so to do and this Lease shall be deemed to have terminated as of such date unless the other party agrees in writing to pay for such repairs or restoration.

9.4    ABATEMENT OF RENT.  Intentionally Omitted.

9.5    DAMAGE DURING FINAL TWO YEARS.  If Landlord is required to repair or restore the Premises and/or the Building under any provision of this Article and Tenant's use of the Premises is

13

STARBUCKS™

affected, then until Landlord completes such repair or restoration, Base Rent and Annual Additional Rent shall abate from the date of destruction based on the degree of impact such damage and repairs have on Tenant's operations within the Premises as measured by the proportionate reduction in Tenant's sales volume.

10.    PROPERTY TAXES.

10.1    DEFINITION OF "REAL PROPERTY TAXES".  For purposes of this Lease, the phrase "Real Property Taxes" shall include general real estate taxes and assessments payable with respect to the Property that are imposed by any authority having the power to tax any legal or equitable interest of Landlord in the Property; provided, however, that assessments shall be prorated and divided into the maximum number of installments permitted by law and only the current portion shall be included in Real Property Taxes for any Lease Year.  Notwithstanding the foregoing, Real Property Taxes shall not include (a) any inheritance, estate, succession, transfer, gift, franchise, or capital stock tax, (b) any gross or net income taxes, (c) any excise taxes imposed upon Landlord based upon gross or net rentals or other income received by it, or (d) assessments levied against the Property prior to the Rent Commencement Date.

10.2    PAYMENT OF REAL PROPERTY TAXES.  As of the Rent Commencement Date, Landlord represents and warrants that (a) Landlord has paid in full all currently due Real Property Taxes, (b) Landlord shall pay when due all future Real Property Taxes and (c) the tax parcel number of the Property is set forth on Exhibit A.  Landlord shall render to Tenant, promptly after the receipt of the tax bill applicable to the Premises for a given period during the Term, a legible copy of such tax bill and a statement showing the amount of Real Property Taxes and indicating in reasonable detail the items included in Real Property Taxes and the computation of Tenant's Pro Rata Share of Real Property Taxes. For each Lease Year during the Term, Tenant shall pay Landlord, as additional rent, Tenant's Pro Rata Share of Real Property Taxes in the manner set forth in Article 12.  Subject to making estimated payments pursuant to Article 12, Tenant shall pay Real Property Taxes only as such taxes become due and payable during the Term (as defined in Section 2.1), prorated for any partial assessment period occurring immediately before the Rent Commencement Date and after the Expiration Date.  Tenant shall have the right to challenge, at its sole expense, the Real Property Taxes and Landlord agrees to provide whatever assistance Tenant may reasonably require.  Upon the request of Tenant, and if required to preserve the right to challenge such taxes, Landlord will pay all Real Property Taxes under protest or in such other manner as will preserve the right to challenge such taxes.  Tenant may challenge Real Property Taxes if Tenant pays any protested amount to Landlord.  Landlord will reimburse Tenant for Tenant's Pro Rata Share of any refund of Real Property Taxes received as a result of any tax contest.

10.3    PERSONAL PROPERTY TAXES.  Tenant shall pay, prior to delinquency, all personal property taxes assessed against Tenant directly and applicable to its personal property located in the Premises.

10.4    PROPERTY TAX PROTECTION.  Intentionally Omitted.

11.    UTILITIES.  Landlord shall pay all utility connection fees (including without limitation all water and sewer connection fees), traffic impact fees and any other extraordinary fees that are associated with the construction of Tenant's Initial Improvements or use of the Premises.  Tenant shall have the right to sufficient utilities and ventilation to support its intended use of the Building.  Without limiting the foregoing, Landlord either (a) represents and warrants that the Building shall have sufficient electrical capacity to allow Tenant to draw 400 amps of service to the Premises without adverse impact on other occupants or the need for an upgrade in utility service, or (b) covenants to upgrade the electrical capacity of the Building prior to the Commencement Date, at Landlord's sole cost and expense, to allow

C:\Documents and Settings\Sping Garden Leasing\Temporary Internet Files\OLK19\Lease.99.doc

STARBUCKS®2007

Tenant to draw 400 amps of service to the Premises. Prior to the Commencement Date, Landlord shall install separate meters for gas, electric, water and sewer services at the Premises in such locations which are accessible to Tenant. Landlord shall maintain such meters at Landlord's sole cost and expense during the Term of this Lease. Subsequent to the Commencement Date, Tenant shall pay directly to the applicable utility provider the utility charges for all water, sewer, gas and electricity used by Tenant during the Term. In the event any utility serving the Premises is not separately metered, Landlord shall, at its sole cost and expense, install a sub-meter prior to the Commencement Date, maintain such meters during the Term and read such meters and submit a utility statement to Tenant at least once each calendar quarter. Such statement shall detail the calculation of Tenant's utility charge and shall be accompanied with a copy of Landlord's utility bill for each period. Landlord shall not charge Tenant a rate for any utility in excess of the rate the Landlord pays the supplier of the service or the rate at which Tenant could purchase the services directly through an available supplier. Tenant shall pay to Landlord a utility charge for any sub-metered utility used by Tenant in the Premises within thirty (30) days after receipt of the documents described above. Landlord shall be deemed to have waived its right to payment for any utility charge unless such charge has been submitted to Tenant within twelve (12) months of the date of Landlord's receipt of such bill or charge from the utility provider. Landlord acknowledges that, subject to all governmental laws, Tenant has the right to contract with and use its own energy service providers and until it does so Landlord may use its own energy service providers to serve the Premises.

12.    TENANT'S PRO RATA SHARE OF COMMON AREA OPERATING EXPENSES, INSURANCE AND TAXES.

12.1    GENERAL DEFINITIONS. The term "Operating Expenses" shall mean the reasonable, out-of-pocket costs and expenses actually paid in any calendar year directly attributable to maintaining, operating, and providing services to and for the Common Areas without duplication, including the costs of utilities, maintenance, supplies and wages, and subject to the exceptions set forth in Section 12.5. If Landlord calculates Operating Expenses on a Lease Year basis, references in this Article to calendar year shall be changed to Lease Year where appropriate. The term "Common Areas" shall mean all portions of the Building (excluding the Premises and any other space in the Building designed to be leased to another tenant for its exclusive use) including landscaped areas, parking lots, and sidewalks. The terms "Landlord's Insurance" and "Real Property Taxes" shall have the meanings assigned in Sections 7.2 and 10.1 respectively and shall not be included in Operating Expenses.

12.2    DEFINITION OF TENANT'S PRO RATA SHARE. Tenant's Pro Rata Share shall be one hundred percent (100%).

12.3    TENANT'S PAYMENT. Commencing on the Rent Commencement Date, for each calendar year of the Term (prorated for any calendar year falling partially within the Term), Tenant shall pay to Landlord as additional rent Tenant's Pro Rata Share of Operating Expenses, Landlord's Insurance and Real Property Taxes (collectively known as "Annual Additional Rent"). Prior to the Rent Commencement Date and at least thirty (30) days prior to the beginning of each calendar year thereafter, Landlord shall furnish to Tenant a written statement setting forth the following: (a) the amount of Landlord's estimate of Tenant's Annual Additional Rent for Operating Expenses (broken down into reasonable categories), Real Property Taxes and Landlord's Insurance for the then upcoming calendar year; (b) Landlord's estimate of Tenant's Annual Additional Rent; and (c) a calculation of one-twelfth (1/12) of Landlord's estimate of Tenant's Annual Additional Rent ("Monthly Estimated Rent"). Landlord's estimates of Tenant's Annual Additional Rent shall be reasonably based on the actual amounts paid by Tenant for such expenses during the previous year. Tenant shall pay to Landlord the Monthly Estimated Rent beginning on the Rent Commencement Date and on the first day of every successive calendar month thereafter during the Term. Monthly Estimated Rent for a period of less than one month shall be prorated on a daily basis based on a

15

STARBUCKS ®1997

three hundred sixty-five (365) day year. Notwithstanding anything contained herein to the contrary, the portion of Tenant's Annual Additional Rent attributable to Operating Expenses for any calendar year shall not exceed one hundred five percent (105%), on a non-cumulative basis, of the portion of Tenant's Annual Additional Rent attributable to Operating Expenses payable by Tenant for the previous year, excluding Operating Expenses properly attributable to Real Property Taxes, utilities and snow removal.

12.4    RECONCILIATION.    For each calendar year of the Term, within sixty (60) days after the end of each calendar year, Landlord shall furnish to Tenant, at the notice address provided for in Section 25, a statement in reasonable detail and certified as complete and correct by an authorized representative of Landlord, including supportive documentation, setting forth (a) Landlord's actual costs for Operating Expenses, Real Property Taxes and Landlord's Insurance for that year by category and amount, (b) the amount of Tenant's Annual Additional Rent, and (c) the sum of Tenant's Monthly Estimated Rent payments made during the year. If the amount of Tenant's Annual Additional Rent exceeds the sum of Tenant's Monthly Estimated Rent payments (and a statement has been received during such sixty (60) day period), Tenant shall pay the deficiency to Landlord within forty-five (45) days after Tenant's receipt of such statement, provided that Tenant may suspend payment of any amount which (x) it disputes in good faith, (y) was paid by Landlord in a calendar year other than the year covered by the statement, or (z) it has not been provided with reasonable details as set forth above, until resolution thereof. If the sum of Tenant's Monthly Estimated Rent payments during the year exceeds the amount of Tenant's Annual Additional Rent, Landlord shall credit the excess to Tenant at the time Landlord furnishes the statement, or, if the Term has not expired, may credit the excess toward the payments of Base Rent and Tenant's Monthly Estimated Rent next falling due. Landlord shall be deemed to have waived its right to payment for any amount which is understated or not included in the statement for the year in which the work was performed or the cost was billed to Landlord.

12.5    EXCLUSIONS FROM OPERATING EXPENSES.    Notwithstanding anything to the contrary contained in this Lease, Operating Expenses shall not include: (a) the initial costs of any item properly chargeable to a capital account using generally accepted accounting principles consistently applied or the original costs of constructing the Building; (b) the cost of any capital addition, repair or replacement to the Building or the Property (or reserves therefor); (c) expenses for which the Landlord is or will be reimbursed by another source (excluding Tenant reimbursement for Operating Expenses), including but not limited to repair or replacement of any item covered by warranty; (d) costs incurred to benefit (or as a result of) a specific tenant or items and services selectively supplied to any specific tenant; (e) expenses for the defense of the Landlord's title to the Property; (f) structural repairs and replacements; (g) depreciation and amortization of the Building or financing costs, including interest and principal amortization of debts; (h) charitable, lobbying, special interest or political contributions; (i) costs of or right to improving or renovating space for a tenant or space vacated by a tenant; (j) any amounts expended by Landlord to comply with any Environmental Laws; (k) costs to correct original or latent defects in the design, construction or equipment of the Building; (l) expenses paid directly by any tenant for any reason (such as excessive utility use); (m) any repair, rebuilding or other work necessitated by condemnation, fire, windstorm or other insured casualty or hazard; (n) any expenses incurred, not caused by Tenant's use or negligence, which are required (i) to comply with any governmental laws, regulations and rules or any court order, decree or judgment including, without limitation, the Americans with Disabilities Act, or (ii) as a result of Landlord's alleged violation of or failure to comply with any governmental laws, regulations and rules or any court order, decree or judgment; (o) leasing commissions, advertising expenses and other costs incurred in leasing or procuring new tenants; (p) rental on ground leases or other underlying leases; (q) attorneys' fees, accounting fees and expenditures incurred in connection with tax contests or negotiations, disputes and claims of other tenants or occupants of the Building or with other third parties except as specifically provided in this Lease; (r) cost of the initial stock of tools and equipment for operation, repair and maintenance of the Building; and (s) amounts billed (directly or indirectly) for salaries, overhead and administrative and/or management fees, office expenses, rent and

STARBUCKS ©2007

office supplies which (i) in the aggregate, exceed fifteen percent (15%) of the Operating Expenses, excluding those described in this subpart (e) of this Section 12.5, (ii) are duplicative, (iii) do not represent actual costs incurred for actual services, or (iv) are administrative and/or management fees related to Common Area utility costs, Landlord's Insurance and/or Real Property Taxes.

12.6    RECORDS.  Landlord shall keep records showing all expenditures incurred as Operating Expenses, Landlord's Insurance and Real Property Taxes for each calendar year for a period of two (2) years following each year, and such records shall be made available for inspection and photocopying by Tenant and/or its agents during ordinary business hours in the city in which the Premises are located.

12.7    DISPUTE RESOLUTION.  Any dispute with respect to Landlord's calculations of Tenant's Annual Additional Rent shall be resolved by the parties through consultation in good faith within sixty (60) days after written notice by Tenant to Landlord.  However, if the dispute cannot be resolved within such period, the parties shall request an audit of the disputed matter from an independent, generally accepted public accounting, reorganization or government firm, whose decision shall be based on generally accepted accounting principles and shall be final and binding on the parties.  If there is a variance of three percent (3%) or more between said decision and the Landlord's determination of Tenant's Annual Additional Rent, Landlord shall pay the costs of said audit and shall credit any overpayment toward the next Base Rent and/or Monthly Estimated Rent payment falling due or pay such overpayment to Tenant within thirty (30) days.  If the variance is less than three percent (3%), Tenant shall pay the cost of said audit.

13.    ASSIGNMENT AND SUBLETTING.  Tenant shall not assign this Lease and shall not let or sublet the whole or any portion of the Premises without the written consent of Landlord, which consent shall not be unreasonably withheld, conditioned, or delayed.  Notwithstanding the foregoing, Tenant may, without Landlord's consent, sublet all or any portion of the Premises or assign this Lease to the following (each, a "Permitted Transfer"): (a) a parent, subsidiary, affiliate, division or other entity controlling, controlled by or under common control with Tenant; (b) a successor entity related to Tenant by merger, consolidation, reorganization or government action; or (c) any entity that engages in a lawful retail or restaurant use not in violation of the Declarations.  Within ten (10) days after Tenant's request of Landlord, Landlord shall provide Tenant with a copy of the restrictions set forth in the Declarations.  For the purpose of this Lease, any sale or transfer of Tenant's capital stock, redemption or issuance of additional stock of any class shall not be deemed an assignment, subletting or any other transfer of this Lease or the Premises.  If Landlord's consent is required for an assignment or sublease, then Landlord's assignment or sublet.  If Landlord's consent is required for an assignment or sublease, then Landlord's consent shall be deemed to have been given unless Landlord notifies Tenant in writing of the reasons for Landlord's disapproval within twenty-one (21) days of receipt of the request.  Unless released in writing, Tenant shall be secondarily liable only for performance of monetary covenants under this Lease following any assignment or sublease other than a Permitted Transfer described in subparts (a) and (b) hereof, in which case Tenant shall remain primarily liable for all covenants under this Lease; provided, however, that Tenant's obligations may not be enlarged or extended by any act or agreement of any assignee or subtenant.

14.    DEFAULTS, REMEDIES.

14.1    TENANT'S DEFAULTS.  The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Tenant:

17

C:\Documents and Settings\lpd\newc and Settings\Temporary Internet Files\OLK3A Lease 09.doc

STARBUCKS ™0307

(e)     The failure by Tenant to make any payment of Base Rent or any other payment required to be made by Tenant hereunder, as and when due, where such failure shall continue for a period of ten (10) business days after Landlord notifies Tenant in writing of such failure; or

(b)     The failure by Tenant to observe or perform any of the covenants, conditions, or provisions of this Lease to be observed or performed by Tenant, other than the payment of sums due hereunder, where such failure shall continue for a period of thirty (30) days after written notice thereof from Landlord to Tenant, provided, however, that if the nature of Tenant's default is such that more than thirty (30) days are reasonably required for its cure, then Tenant shall not be deemed to be in default if Tenant commences such cure within such thirty (30) day period and thereafter diligently pursues such cure to completion.

14.2     REMEDIES IN DEFAULT.  In the event of any such uncured default, Landlord may, in accordance with procedures required by law, pursue one of the following remedies:

(a)     Landlord may terminate Tenant's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Tenant shall surrender possession of the Premises to Landlord within thirty (30) days after written notice from Landlord to Tenant.  In such event, Landlord shall be entitled to recover from Tenant all damages incurred by Landlord by reason of Tenant's default including, but not limited to, the cost of recovering possession of the Premises, expenses of reletting (but excluding necessary renovation and alteration of the Premises for use by a subsequent tenant or occupant), and the Base Rent and Annual Additional Rent as it becomes due hereunder; provided that Tenant shall not be entitled to a credit against such amounts equal to (i) the amounts received by Landlord by re-leasing the Premises or otherwise mitigating its damages or (ii) if Landlord fails to re-lease the Premises, the fair market rental value of the Premises for the applicable period.  If Landlord relets the Premises, then any rent or other concessions given to the new tenant shall be prorated evenly throughout the entire term of the new lease; or

(b)     Landlord may maintain Tenant's right to possession, in which case this Lease shall continue in effect whether or not Tenant shall have abandoned the Premises.  In such event, Landlord shall be entitled to enforce all of Landlord's rights and remedies under this Lease including the right to recover the Base Rent and Annual Additional Rent as it becomes due hereunder.

Notwithstanding the foregoing, with respect to any remedy exercised by Landlord, Landlord shall have an affirmative obligation to obtain another tenant for the Premises promptly, at a fair market rental, and to otherwise mitigate its damages.

14.3     LANDLORD DEFAULTS AND REMEDIES.  The occurrence of any one or more of the following events shall constitute a default and breach of this Lease by Landlord: (a) Landlord's failure to do, observe, keep and perform any of the terms, covenants, conditions, agreements or provisions of this Lease required to be done, observed, kept or performed by Landlord, within thirty (30) days after written notice by Tenant to Landlord of said failure (except when the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be deemed in default if it commences performance within the thirty (30) day period and thereafter diligently pursues the cure to completion), or (b) the failure of any material representation or warranty to be true when deemed given hereunder.  In the event of a default by Landlord, Tenant, at its option, without further notice or demand, shall have the right to any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity or elsewhere herein: (i) to remedy such default or breach and deduct the costs thereof (including attorneys' fees) from the installments of Base Rent and Annual Additional Rent next falling due; (ii) to pursue the remedy of specific performance; (iii) to seek money damages for loss arising from Landlord's failure to discharge its

STARBUCKS™

obligations under this Lease, and (vi) to terminate this Lease. Nothing herein contained shall relieve Landlord from its obligations hereunder, nor shall this Section be construed to obligate Tenant to perform Landlord's repair obligations.

15. CONDEMNATION.

15.1 CONDEMNATION OF PREMISES. If any portion of the Premises is taken by a government entity exercising the power of eminent domain, or sold to a government entity by Landlord under the threat of the exercise of said power (the final judicial order that permits the taking is herein referred to as "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes possession of the condemned portion of the Premises (the "Condemnation Date"). If so much of the Premises is taken, that in Tenant's reasonable business judgment, the Premises are no longer reasonably suitable for Tenant's operations, Tenant may terminate this Lease. If the entire Premises are condemned, then this Lease shall automatically terminate as of the Condemnation Date. The party who receives the condemnor's notice of intention to take (the "Condemnation Notice") shall immediately give a copy of such notice to the other party.

15.2 CONDEMNATION OF THE PROPERTY. If as a result of any condemnation of the Property or any portion thereof (even though the Premises are not physically affected), if either (a) the Premises, or Property are no longer reasonably suited for the conduct of Tenant's business in Tenant's reasonable business judgment, (b) the number of parking spaces on the Property is reduced by (c) the more than six (6) spaces and Landlord does not provide alternative equally accessible parking, or (c) the drive-through lane configuration and/or access (including any turning radius or stacking lane) for the drive-through is materially and negatively affected, then Tenant may terminate this Lease at any time after Tenant receives the Condemnation Notice by giving Landlord thirty (30) days written notice.

15.3 CONDEMNATION OF THE BUILDING. Intentionally Omitted.

15.4 RESTORATION. If this Lease is not terminated, (a) it shall remain in full force and effect as to the portion of the Premises remaining, provided the Base Rent and all other charges payable hereunder shall be reduced in the same proportion that the area taken bears to the total area of the Premises prior to taking, and (b) Landlord shall use the condemnation award to restore the Premises and the Building as soon as reasonably possible to a complete unit of the same quality, character and utility for Tenant's purposes existing prior to the condemnation. Notwithstanding anything contained herein to the contrary, if the restoration and/or the Building is not commenced within thirty (30) days of Landlord's receipt of the condemnation award or is not completed within one hundred eighty (180) days from the Condemnation Date, then Tenant may terminate this Lease at any time before Landlord completes the restoration. If this Lease is terminated, Landlord shall return any deposits, all prepaid Base Rent and other prepaid sums to Tenant within thirty (30) days of the date of termination of this Lease.

15.5 AWARD. Landlord and Tenant may each pursue any condemnation award to which it is entitled by applicable law. Tenant may recover from the condemning authority or from Landlord (if Tenant can show that such amount was included in Landlord's award) that portion of any net award or payment attributable to Tenant's work or installations in the Premises, including without limitation, the unamortized value of improvements installed in the Premises by Tenant at Tenant's expense based on straight-line depreciation over the initial Term of this Lease without regard to the condemnation. For the purposes of this Section, a "net" award or payment shall mean the entire award or payment for such taking, less the actual and reasonable expenses incurred in collecting such award or payment.

19

16.     SIGNAGE. Tenant, at its cost, shall have the right to install or place signs, awnings, or other advertising materials in, on or about the Premises, including all directional signs, menu boards, and signage associated with the drive-through facility, to the maximum extent permitted by law; provided that Tenant obtains Landlord's consent (a) as to the method of attaching signs that will be permanently attached to the exterior of the Building or on monuments or pylons (collectively "Exterior Signage"), (b) for any awnings; and (c) for the location of the Exterior Signage and design of the monument or pylon sign panels. Landlord shall not unreasonably withhold, condition or delay its consent to the extent Landlord's consent is required. Landlord shall submit plans and specifications for its Exterior Signage and awnings to Landlord for approval prior to submitting the plans and specifications to the local authorities for permitting. Landlord shall be deemed to have consented to such proposed Exterior Signage and awnings unless Landlord notifies Tenant in writing of its specific objections within fourteen (14) days of receiving such proposal. All Exterior Signage and awnings shall be in compliance with all applicable laws, regulations and rules. Landlord shall not vary or change the location, size or position of Tenant's signage, including but not limited to the position of Tenant's signage on any pylon or monument sign. Notwithstanding anything contained herein to the contrary, Landlord hereby consents to, and Tenant shall be permitted to install, Tenant's then-current trademarked name(s), colors, letters, logo and logo in Tenant's signage. Notwithstanding anything contained herein to the contrary, Tenant shall not be required to obtain Landlord's consent for any promotional or advertising signs or displays within the interior of the Premises. Landlord shall not allow any signage other than Tenant's to be erected on the exterior walls of the Premises or on the roof above the Premises or any where on the Property.

If Landlord materially changes Landlord's sign criteria after Tenant executes this Lease (whether or not the change are being required by a governing authority), then Landlord shall submit Landlord's new sign criteria ("New Sign Criteria") for Tenant's review and approval (in Tenant's sole and absolute discretion). Tenant shall approve or disapprove Landlord's New Sign Criteria or request modifications to Landlord's New Sign Criteria. Landlord shall reimburse Tenant for the actual cost for Tenant to remove the old signage and manufacture and install its new signage ("New Sign Costs") to correspond with Landlord's New Sign Criteria. If Tenant does not approve Landlord's New Sign Criteria or if Landlord and Tenant fail to agree on an acceptable revisions to Landlord's New Sign Criteria, Tenant may terminate this Lease by giving written notice to Landlord. If Tenant does not terminate the Lease and Landlord has not paid Tenant its New Sign Costs within thirty (30) days after Tenant installs its new signage, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the New Sign Costs are fully offset.

If Landlord requests that Tenant temporarily remove Tenant's Exterior Signage after installation for any reason and Tenant consents to such removal in writing, Landlord shall reimburse Tenant for the actual cost incurred by Tenant to remove, store and re-install the Exterior Signage. If Landlord has not paid Tenant those costs within thirty (30) days after Tenant re-installs its Exterior Signage, then in addition to any other remedies Tenant has, Tenant may offset the unpaid amount against Base Rent and all other charges (at Tenant's discretion) until the Tenant's costs are fully offset.

17.     PERMIT CONTINGENCY. Tenant's obligations under this Lease are conditioned on Tenant's obtaining, within one hundred twenty (120) days after the later of either (i) the mutual execution and delivery of this Lease or (ii) the date Landlord delivers to Tenant final plans for the Building in an industry standard electronic or digital format that have been approved by all applicable governmental entities, any permits and/or licenses (including but not limited to conditional use permits, building permits, variances and other governmental approvals) (collectively, "Government Approvals") that are required to enable Tenant legally (a) to construct Tenant's improvements to the Premises in accordance with the Plans; (b) to install Tenant's signage on the Premises; (c) to conduct its business from the Premises; and (d) to provide and operate outdoor seating for the Premises. Tenant shall, at Tenant's expense, initiate and diligently pursue each Government Approval. Landlord shall

C:\Documents and Settings\nglen\Local Settings\Temporary Internet Files\OLK3\Lease 6Pb.doc

20

STARBUCKS ©2007

execute any applications and shall provide Tenant with such further assistance and cooperation as Tenant may require in connection with applications for such Government Approvals. If Tenant does not obtain such Government Approvals on terms satisfactory to Tenant within such period, Tenant shall have the right to terminate this Lease, subject to Landlord's right to obtain such Government Approvals as set forth herein. In the event Tenant is unable to obtain such permits within such one hundred twenty (120) day period, Landlord shall for an additional period of sixty (60) day following the expiration of the foregoing one hundred twenty (120) day period at Landlord's sole cost and expense, except for the actual cost of the permit and/or license, attempt to obtain all such permits and/or licenses on Tenant's behalf. At the expiration of such additional sixty (60) day period, Landlord shall provide Tenant with written notice of whether or not Landlord was successful in obtaining such permits and/or licenses. In the event Landlord is unable to obtain such permits within such sixty (60) day period, Tenant shall have the right to terminate this Lease. If any Government Approvals are not renewed or are revoked during the Term of this Lease due to Landlord's conduct, Tenant shall have the right to terminate this Lease. Tenant shall vacate the Premises within thirty (30) days after exercising the option to terminate as herein provided.

18.    OUTDOOR SEATING.  If such seating is permitted by the local authorities, Tenant may provide outdoor seating for its customers on property owned by Landlord adjacent to the Premises (the "outdoor seating area") provided that, the outdoor seating area shall be agreed upon by Landlord and Tenant at any time during the Term of this Lease at no additional rental. Tenant, at its cost, shall comply with all relevant state, municipal or local laws, regulations, rules or ordinances applicable to its operations in the outdoor seating, and shall obtain all necessary permits or licenses for the same. Tenant shall take reasonable steps to keep the outdoor seating area exclusively serving its customers reasonably clean and neat.

19.    TENANT'S RIGHT OF EARLY TERMINATION.  Intentionally Omitted.

20.    TENANT'S USE OF COMMON AREAS.  Tenant shall have the right to use any and all appurtenances and easements benefiting the Premises and the Building, along with sufficient Common Areas and parking to support its intended use of the Premises, including such portions as are necessary for Tenant's operation of the drive-through facility, including necessary stacking lanes.  In addition to the foregoing, Tenant shall have the right of access to such portions of the Common Areas as are necessary to enable Tenant to exercise its rights under this Lease.  Landlord shall not allow any permanent or temporary kiosk, cart, or other obstruction to be constructed or placed on the Property.  Any changes, additions or alterations to the Premises, the Property or the Building shall not (a) impair access to, visibility of, or frontage of the Premises; (b) materially affect the conduct of Tenant's customary business therein; or (c) detract from Tenant's signage, create confusion regarding the business conducted in the Premises, or adversely affect the presentation of Tenant's exterior signage and storefront.  In the event of any such interference, in addition to Tenant's other rights and remedies under applicable law and this Lease, the Base Rent and Annual Additional Rent shall be equitably abated based on the degree of interference with Tenant's business.

21.    PARKING AND ACCESS.  At no expense to Tenant and/or its employees or customers, Landlord shall provide all parking for Tenant's employees and customers (and Landlord shall apply for and obtain all variances in connection therewith), as needed to meet all code and permitting requirements for Tenant's anticipated use throughout the Term.  Landlord shall not vary or permit to be varied the existing means of ingress and egress to the Building and the Property.  Landlord shall not reduce the number of parking spaces below that which is required by law for Tenant to maintain its permit to use and occupy the Premises or realign the parking spaces in a manner that makes them substantially less

STARBUCKS ©2007

accessible to the Premises. Tenant shall have the exclusive right to use all of the parking spaces on the Property.

22. TRASH REMOVAL. Tenant shall arrange for its trash and recycling services and shall pay such costs directly to the company providing such service. Landlord shall provide Tenant with a lawful location on the Property (as shown on Exhibit E-1) to store a four cubic-yard trash container and a three cubic-yard recycling container. Such storage location shall be (a) exclusively for Tenant's use, (b) at least twenty (20) feet long and seven (7) feet wide, (c) enclosed if required by code or by the terms of Exhibit C and (d) convenient to the Premises. Landlord shall arrange with a waste management company to provide adequate trash and recycling services to the tenants of the Building. Furthermore, any trash or recycling container opening shall have a maximum height of three feet (3') from ground level. If the container opening is higher than three feet (3') from ground level, an appropriate step shall be provided by Landlord so that the container opening is three feet (3') or less from the top of the step. Where available, container lids shall be comprised of plastic or rubber. Landlord shall pay the costs of such trash removal and recycling services (including usage of such containers) directly to the company providing such service. Landlord shall submit an invoice to Tenant for such trash and recycling services at least once each calendar quarter. Tenant shall pay to Landlord its share of trash and recycling service charges, which shall be one hundred percent (100%), within thirty (30) days after receipt of a written invoice from Landlord. Landlord shall be deemed to have waived its right to payment for any trash and recycling charge unless such invoice has been submitted to Tenant within twelve (12) months of the date of Landlord receives such invoice from the service provider.

23. GENERAL PROVISIONS.

23.1 ESTOPPEL CERTIFICATE. Tenant shall, no more than twice in any Lease Year and upon not less than thirty (30) days prior written notice from Landlord, execute, acknowledge and deliver to any prospective purchaser or mortgagee, or to Landlord on such party's behalf a statement in writing on Tenant's standard form or on such other form as it is reasonably acceptable to Tenant, certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect), (ii) stating the date to which the Base Rent and other charges are paid and the amount of any security deposit held by Landlord, if any, and (a) acknowledging that there are not, to the actual knowledge of the person executing such certificate, any uncured defaults on the part of Landlord hereunder, or specifying such defaults, if any, which are claimed. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises. Such certificates shall not affect, prejudice or waive any rights or remedies of Tenant against Landlord.

23.2 LANDLORD'S INTERESTS. Landlord represents and warrants to Tenant that as of the Commencement Date, (a) Landlord owns and holds fee title in and to the Building, the Premises and the Property enabling Landlord to enter into an enforceable lease with Tenant on the terms and conditions contained herein, (b) the real property identified on Exhibit A contains the Premises described in Section 1.1, (c) there are no encumbrances, liens, agreements, covenants in effect that would limit Landlord's rights or supersede Tenant's obligations hereunder, and Landlord further represents and warrants that it will not enter into any such encumbrances, liens, agreements or covenants that do so, (d) Landlord is unaware of any impending condemnation plans, proposed assessments or other adverse conditions relating to the Property. Landlord will indemnify and hold Tenant harmless if any of the foregoing representations and warranties prove to be untrue. The term "Landlord" as used herein shall mean only the owner or owners, at the time in question, of the fee title (or a tenant's interest in ground lease) of the Premises. In the event of an assignment or transfer of this Lease by Landlord for other than security purposes, Landlord shall cause its assignee or transferee to assume the provisions of this Lease and deliver a new notice address to Tenant and Landlord shall deliver written notice of such assignment or

© Starbucks and Starbucks and Starbucks Source Price PLACES Lease Plan

STARBUCKS ®1997

transfer and a copy of the effective instrument of transfer to Tenant within fifteen (15) days after the date of transfer. Tenant shall be entitled to continue to pay rent and give all notices to Landlord until Tenant has received the foregoing from Landlord and notice information from Landlord's transferee. Landlord shall deliver all funds in which Tenant has an interest, including but not limited to Tenant's security deposit, if any, to Landlord's purchaser or assignee. From and after a sale of the Premises or the Building, Landlord shall be released from all liability toward Tenant arising from this Lease because of any act, occurrence or omission of Landlord's successors occurring after the transfer of Landlord's interest in this Lease, provided Landlord's purchaser or assignee expressly assumed Landlord's duties and covenants under this Lease. Nothing herein shall be deemed to relieve Landlord of any liability for its acts, omissions or obligations occurring or accruing up to and including the date of such transfer.

23.3    AUTHORITY. Each of Landlord and Tenant hereby represents and warrants that this Lease has been duly authorized, executed and delivered by and on its behalf and constitutes such party's valid and binding agreement in accordance with the terms hereof.

23.4    SEVERABILITY. The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

23.5    TIME OF ESSENCE. Time is of the essence to the parties executing this Lease.

23.6    INTERPRETATION. Article and section headings are not a part hereof and shall not be used to interpret the meaning of this Lease. This Lease shall be interpreted in accordance with the fair meaning of its words and both parties certify they either have been or have had the opportunity to be represented by their own counsel and that they are familiar with the provisions of this Lease, which provisions have been fully negotiated, and agree that the provisions hereof are not to be construed either for or against either party as the drafting party.

23.7    INCORPORATION OF PRIOR AGREEMENTS; AMENDMENTS. This Lease contains all agreements of the parties as of the date hereof with respect to any matter mentioned herein. No prior agreement, correspondence or understanding pertaining to any such matter shall be effective to interpret or modify the terms hereof. This Lease may be modified only in writing, signed by the parties in interest, at the time of the modification. Landlord specifically acknowledges that Tenant's employees at the Premises do not have authority to modify this Lease or to waive Tenant's rights hereunder.

23.8    WAIVERS. No waiver by Landlord or Tenant of any provision hereof shall be deemed a waiver of any other provision hereof or of any subsequent breach by Tenant or Landlord of the same or any other provision. A party's consent to or approval of any act shall not be deemed to render unnecessary the obtaining of such party's consent to or approval of any subsequent act. No waiver shall be effective unless it is in writing, executed on behalf of Landlord or Tenant by the person to whom notices are to be addressed.

23.9    RECORDING. Landlord or Tenant may record a short form or memorandum of lease at its own expense. At Tenant's request, the parties shall execute a memorandum of lease in recordable form giving notice of such nonmonetary terms as Tenant may reasonably request, including Tenant's exclusivity and option rights. If Tenant exercises such option, upon termination or expiration of this Lease, Tenant shall, at its sole expense, remove such recorded memorandum from title records.

23.10    HOLDING OVER. If Tenant remains in possession of the Premises or any part thereof after the expiration of the Term, with or without the consent of Landlord, such occupancy shall be a tenancy from month-to-month at a rental in the amount of the Base Rent payable in the last month of the

23

STARBUCKS ©2007

C:\Documents and Settings\nydoe\Local Settings\Temporary Internet Files\OLK5F\Lease 09.doc

Term, plus all other charges payable hereunder, and upon the terms hereof applicable to month-to-month tenancies.

23.11 CUMULATIVE REMEDIES. Except where otherwise expressly provided in this Lease, no remedy or election hereunder shall be deemed exclusive, but shall, wherever possible, be cumulative with all other remedies at law or in equity.

23.12 BINDING EFFECT; CHOICE OF LAW. The Lease shall be binding upon and benefit the parties, their personal representatives, successors and assigns. The Lease shall be governed by the laws of the state where the Premises are located.

23.13 SUBORDINATION; NONDISTURBANCE AND ATTORNMENT. This Lease shall be subordinate to all existing and future mortgages and/or deeds of trust on the Premises, the Building or the Property, and Tenant agrees to subordinate this Lease to any future mortgage or deed of trust and to attorn to Landlord's successor following any foreclosure, sale or transfer in lieu thereof; provided that the mortgagee, transferee, purchaser, lessor or beneficiary ("Landlord's Successor") agrees in a written instrument in form and substance satisfactory to Tenant that Tenant's use or possession of the Premises shall not be disturbed, nor shall its obligations be enlarged or its rights be abridged hereunder by reason of any such transaction. Notwithstanding any foreclosure or sale under any mortgage or deed of trust (or transfer by deed in lieu thereof), this Lease shall remain in full force and effect.

23.14 LANDLORD'S ACCESS. Landlord and Landlord's agents shall have the right to enter the Premises upon forty eight (48) hours prior written notice for the purpose of inspecting the same, showing the same to prospective purchasers or lenders, and making such alterations, repairs, improvements or additions to the Premises or to the Building as Landlord deems necessary or desirable. Notwithstanding the foregoing, in the case of an emergency requiring Landlord's entry into the Premises, Landlord may give Tenant shorter notice in any manner that is practicable under the circumstances. Landlord may, at any time, place on or about the Premises an ordinary "For Sale" sign, and Landlord may at any time during the last sixty (60) days of the Term, place on or about the Premises an ordinary "For Lease" sign. Any such sign shall be no larger than two feet by two feet (2' x 2') and shall comply with all municipal restrictions. When entering or performing any repair or other work in the Premises, Landlord, its agents, employees and/or contractors (a) shall identify themselves to Tenant's personnel immediately upon entering the Premises, and (b) shall not, in any way, materially or unreasonably affect, interrupt or interfere with Tenant's use, business or operations on the Premises or obstruct the visibility of or access to the Premises. In the event of substantial, material or unreasonable interference, the Base Rent and Annual Additional Rent shall be equitably abated if the interference continues for more than twenty four (24) hours. In the event such interference shall continue for longer than six (6) months, Tenant shall have the option to terminate this Lease or continue to operate with rent abatement after such interruption has ceased for a time period equal to the time period of such interruption.

23.15 ONLY LANDLORD/TENANT RELATIONSHIP. Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent, partnership, joint venture or any association between Landlord and Tenant. Landlord and Tenant expressly agree that neither the method of computation of rent nor any act of the parties hereto shall be deemed to create any relationship between Landlord and Tenant other than the relationship of Landlord and Tenant.

23.16 ATTORNEY'S FEES. If either party brings an action or proceeding to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, proceeding, trial or appeal, shall be entitled to its reasonable attorneys' fees to be paid by the losing party as fixed by the court.

STARBUCKS

C:\Documents and Settings\nyhe\Local Settings\Temporary Internet Files\OLK3A\Lease 04 doc

23.17   FORCE MAJEURE.   In the event that either party shall be delayed or hindered in or prevented from the performance of any covenant, agreement, work, service, or other act required under this Lease to be performed by such party (a "Force Majeure Event"), and such delay or hindrance is due to causes entirely beyond its control such as riots, insurrections, martial law, civil commotion, war, fire, flood, earthquake, or other casualty or acts of God ( a "Force Majeure Event"), then the performance of such Required Act shall be excused for the period of delay, and the time period for performance of any Required Act shall be extended by the same number of days in the period of delay. For purposes of this Lease, the financial inability of Landlord or Tenant to perform any Required Act, including (without limitation) failure to obtain adequate or other financing, shall not be deemed to constitute a Force Majeure Event. A Force Majeure Event shall not be deemed to commence until the ten (10) days before the date on which the party who asserts some right, defense or remedy arising from or based upon such Force Majeure Event gives written notice thereof to the other party hereto. If abnormal adverse weather conditions are the basis for a claim for an extension of time due to a Force Majeure Event, the written notice shall be accompanied by data substantiating (i) that the weather conditions were abnormal for the period of time and (ii) that the weather conditions could not have been reasonably anticipated and had a significant adverse effect on the performance of a Required Act. To establish the extent of any delay to the performance of a Required Act due to abnormal adverse weather, a comparison will be made of the weather for the time of performance of the Required Act with the average of the preceding ten (10) years climatic range based on the National Weather Service statistics for the nearest weather reporting station to the Premises. No extension of time for or excuse for a delay in the performance of a Required Act will be granted for rain, snow, wind, cold temperatures, flood or other natural phenomena of normal intensity for the locality where the Premises are located.

23.18   CONFIDENTIALITY OF LEASE.   From and after the date lease negotiations were entered into and throughout the Term of this Lease, the parties shall not disclose any of the terms, covenants, conditions or agreements set forth in the letters of intent or in this Lease or any amendments hereto, nor provide such correspondence, this Lease, any amendment hereto or any copies of the same, nor any other information (oral, written or electronic) which is communicated by or on behalf of Tenant or on behalf of Landlord relating to Tenant's proposed development of the Premises (including, without limitation, architectural plans, specifications, site plans and drawings) or Tenant's business, to any person including, without limitation, any brokers, any other tenants in the Building or any affiliates, agents or employees of such tenants or brokers except as set forth herein, without Tenant's written consent or except as ordered by a court with appropriate authority provided Landlord seeks available protective orders. Landlord hereby acknowledges that the disclosure of the foregoing to any third party would cause material damage to Tenant, and Landlord agrees to indemnify, save and hold Tenant harmless from and against any and all damages suffered by Tenant which are attributable to any disclosure by Landlord in violation of the terms of this provision. Notwithstanding the foregoing, Landlord may disclose the terms of this Lease to those of its partners, employees, consultants, contractors, architects, brokers, agents, prospective purchasers, attorneys, accountants, current or potential mortgagees, lenders or purchasers of the Property who agree to be bound by the terms of this Section and Tenant may disclose the terms of this Lease to those of its partners, employees, consultants, attorneys, accountants and current or potential lenders, assigns or subtenants who agree to be so bound.

23.19   BROKERS.   Landlord agrees to pay a brokerage commission to Baum Realty Group, Inc. for services provided in connection with this Lease in accordance with the terms of a separate commission agreement. Except as specifically identified in this Section, Landlord and Tenant each represent to the other that they have not dealt, directly or indirectly, in connection with the leasing of the Premises, with any other broker or person entitled to claim a commission or leasing fees. In no event may this Lease be construed to create any express or implied obligation on the part of Tenant to perform this Lease on behalf of any broker (or any person claiming a commission or leasing fee) as primary obligee or as a third party beneficiary. Landlord and Tenant each shall indemnify and hold each other harmless from

25

© Stoneman and Saving Suydless Lend Saving's Temporary Tenant First GOLD Lease 99 size

any loss, liability, damage, or expense (including without limitation reasonable attorneys' fees) arising from any claim for a commission or leasing fee arising out of this transaction made by any unidentified broker or other person with whom such party has dealt.

23.20   CONSENTS.   Whenever the right of approval or consent is given to a party pursuant to this Lease, that party shall not unreasonably withhold, condition or delay its consent unless this Lease expressly provides otherwise.

23.21   WAIVER OF JURY TRIAL.   With respect to any litigation arising out of or in connection with this Lease, Landlord and Tenant hereby expressly waive the right to a trial by jury.

23.22   OTHER STORES.   Notwithstanding anything in this Lease to the contrary, under no circumstances do the parties to this Lease intend to limit or otherwise affect in any way the ability or right of Tenant and Tenant's affiliates to open, operate, merchandise or close any stores anywhere, regardless of any proximity to the Premises or the potential or actual effect of the opening, operation, merchandising or closing of such stores, and further regardless of any obligations or rights based on the sales generated at the Premises expressly set forth in this Lease. Without limiting the generality of the foregoing, the parties confirm that neither Tenant nor its affiliates are subject to a so-called "continuous operation clause", "operating covenant", "radius restriction" or similar limitation in favor of Landlord or its affiliates.

24.   QUIET ENJOYMENT.   Without limiting any rights Tenant may have by statute or at common law, Landlord covenants and agrees that, so long as this Lease is in full force and effect, Tenant shall lawfully and quietly hold, occupy and enjoy the Premises during the Term of this Lease without disturbance by Landlord or by any person having title paramount to Landlord's title or by any person claiming through or under Landlord.

25.   NOTICES.   Whenever a provision is made under this Lease for any demand, notice or declaration of any kind (even if the provision does not expressly require notice in writing), or where it is deemed desirable or necessary by either party to give or serve any such notice, demand or declaration to the other party, it shall be in writing and served either personally or sent by United States mail, certified, postage prepaid, or by pre-paid nationally recognized overnight courier service, addressed at the addresses set forth below or at such address as either party may advise the other from time to time. Any such notice, demand or declaration which does not comply with the foregoing requirements above shall be ineffective for purposes of this Lease.

To Landlord at:

CTK, LLC
3909 West 140th Street
Leawood, KS 66224
Attention: Chris T. Kamberis

With a copy of default notices to:

Kaplan Papadakis & Gournis, P.C.
180 North LaSalle Street, Suite 2108
Chicago, IL 60601
Attention: Dean J. Papadakis, Esq.

To Tenant at:

Starbucks Corporation
Attn: Property Management Department
RE: Starbucks Coffee Company Store #13787
Mailstop S-RE5

by mail at:

> P.O. Box 34067
> Seattle, WA  98124-1067

or by overnight delivery to:

> 2401 Utah Avenue South, Suite 800
> Seattle, WA  98134

Notices, demands, or declarations given under this Lease will be deemed to have been given when received or when receipt is refused.

Landlord shall send a duplicate copy of any notice given under Article 14 to the attention of the Law and Corporate Affairs Department at the same address, Mailstop S-LA1.

26.    EXHIBITS.  The following exhibits are attached to this Lease and by this reference are incorporated herein:

Exhibit A       Legal Description
Exhibit B       Site Plan Identifying Premises
Exhibit B-1     Diagram of Premises, Drive-Through Lanes, Parking and Trash Locations
Exhibit B-2     Outdoor Seating Area
Exhibit C       Construction Requirements
Exhibit D       Delivery of Possession Letter
Exhibit E       Landlord Work Modification Letter
Exhibit F       Date Certificate
Exhibit G       Use Restrictions
Exhibit H       Environmental Reports

IN WITNESS WHEREOF, the parties have executed this Lease as of the date first above written.

LANDLORD:
CTK, LLC
a Kansas limited liability company

By: _____
Its _____

Landlord's Federal Tax Identification
Number: 48-1212480

TENANT:
STARBUCKS CORPORATION,
a Washington corporation

By: _____
**Craig Russell**
vice president, existing stores strategy
Store Development

27

STARBUCKS ® 1997

C:\Documents and Settings\SqrQure\Local Settings\Temporary Internet Files\OLK32\Lease 09 doc

STATE OF ILLINOIS      )
                       ) ss.
COUNTY OF COOK         )

On this _24th_ day of September, 2007, before me personally appeared Chris T. Kamberis, to me known to be the Member of CTK, LLC, a Kansas limited liability company, the limited liability company that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute said instrument and that the seal affixed, if any, is the corporate seal of said limited liability company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

Signature: _Nikisi Robinson_

Name (print): _Nikisi Robinson_

NOTARY PUBLIC in and for the State of Illinois, residing at _200 N. Jefferson, Chicago, IL 60661_

My appointment expires: _8-28-2011_

```
OFFICIAL SEAL
NIKISI ROBINSON
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 8-28-2011
```

28

C:\Documents and Settings\kgl\Local Settings\Temporary Internet Files\OLK32F\Lease 09.doc

STARBUCKS ©2007

STATE OF WASHINGTON  )
                     )ss.
COUNTY OF _Kung_      )

On this _13TH_ day of _September_, 200_7_, before me personally appeared _Ken Barrier_, of STARBUCKS CORPORATION, the corporation that executed the within and foregoing instrument, and acknowledged said instrument to be the free and voluntary act and deed of said corporation, for the uses and purposes therein mentioned, and on oath stated that _he is_ authorized to execute said instrument and that the seal affixed, if any, is the corporate seal of said corporation.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year first above written.

Signature _____

Name (print) _Kevin D. Cobb_

NOTARY PUBLIC in and for the State of Washington, residing at _Kings County_
My appointment expires: _3-29-2011_

KEVIN D. COBB
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
MARCH 29, 2011

C:\Documents and Settings\jg\Own Local Settings\Temporary Internet Files OLK3A\Lease 09.doc

29

STARBUCKS © 2007

## EXHIBIT A

## LEGAL DESCRIPTION

That certain tract of land situated in the County of DuPage, State of Illinois and more particularly described on the following page.

Tax Parcel Number: _____

A-1

© 2001 Starbucks Corporation
Reserved. STARBUCKS

EXHIBIT B

SHOPPING CENTER SITE PLAN IDENTIFYING PREMISES

© 2001 Starbucks Corporation
Revised 1/15/02
STARBUCKS



EXHIBIT B-1

DIAGRAM OF PREMISES, DRIVE THROUGH LANES, PARKING AND TRASH ENCLOSURES

© 2001 Starbucks Corporation
Revised STARBUCKS

EXHIBIT B-2
OUTDOOR SEATING AREA

© 2001 Starbucks Corporation
Revised STARBUCKS

EXHIBIT C

CONSTRUCTION REQUIREMENTS

C-1

© 2001 Starbucks Corporation
Revised STARBUCKS

JUN-21-2006   17:58

June 19, 2006
Page 6 of 11

P-06/11

# LANDLORD WORK LETTER

## EXHIBIT C-1
## CONSTRUCTION REQUIREMENTS
## AND STANDARDS

Site #C-19.1

Site name:    1030 E Providext and Roosevelt, Wheaton Illinois

1.   **Landlord Construction**

Landlord's Work to be completed prior to delivering possession of the Premises to the Tenant and in compliance with standard construction practices and of applicable codes.

Landlord will provide the Tenant with a copy of Landlord's construction schedule including the norms, phone number and address of Landlord's contractor and construction manager.

Landlord shall provide Tenant with a monthly construction status report. Tenant's construction manager, or its designated representative, may enter upon the Premises during construction of Landlord's Work to inspect the progress, take photographs and to determine if Landlord's Work is being completed in accordance with Tenant's standards, plans and specifications. Upon the completion of the Landlord's Work, the Tenant shall inspect for compliance to the lease.

2.   **Tenant's Completion of Landlord's Work**

Landlord's Work shall be completed in accordance with the Lease and Landlord's construction schedule. Tenant shall retain the option to complete Landlord's Work at Landlord's sole expense in the event the Landlord's Work is not completed in accordance with the lease and Landlord's construction schedule.

3.   **Parties Obligations Upon Delivery of Possession**

Upon delivery of possession of the Premises to Tenant, Tenant shall inspect the Premises to determine whether Landlord's Work has been completed. At this time, Landlord and Tenant shall execute the Delivery of Possession (Exhibit B).

1030 West Chicago Avenue, Suite 200 · Chicago, Illinois 60621 · Phone 312.666.5000 · Fax 312.666.9770

STARBUCKS

JUN-21-2006 17:56

June 19, 2004
Page 7 of 11

Site #K/R.1

P-007-11

## EXHIBIT C-2
### Description of Landlord Work
New and/or Existing Construction

| CSI # | Scope Criterion | Detail |
|---|---|---|
| 02000 | Complete Demolition | |
| 02000 | Utility Services | |
| 16050 | Power Distribution | |
| | Water Distribution | |
| | Sanitary Sewerage | |
| | Gas Distribution | |
| 02050 | Site Electrical Distribution | |

LL Initials

Starbucks Initials

1030 West Chicago Avenue, Suite 300 · Chicago, Illinois 60622 · Phone 312.664.3000 · Fax 312.664.7970

STARBUCKS



STARBUCKS



STARBUCKS



STARBUCKS

STARBUCKS

JUN-21-2006  17:56

June 19, 2006
Page 11 of 11

Site #K-191

P.11/11

## Drive Thru Components

| 02600 | DT- Sign Electric Distribution | |
| 02650 | DT-Traffic Sign Base/Foundation | |
| 02690 | DT-Site Concrete | |
| 02800 | DT-Drive Thru Windows | |
| 10355 | DT- Awning - Sign | |
| 16600 | DT- Site - Lighting | |

1050 West Chicago Avenue, Suite 200 • Chicago, Illinois 60622 • Phone 312.664.5000 • Fax 312.664.7990

TOTAL  P.11

EXHIBIT D

DELIVERY OF POSSESSION

Project Name: _____    Store #: _____

Date Possession Tendered: _____

Tenant: Starbucks Corporation

Landlord: _____

Premises Address: _____

Square Footage: _____

Landlord and Tenant acknowledge and agree that

☐ Landlord's Work is complete and accepted by Tenant as of the Possession Date noted above, subject to the terms and conditions of the Lease regarding latent defects and completion of punchlist items within fourteen (14) days.

☐ Although the items of Landlord's Work indicated below are not complete, Tenant hereby accepts possession of the Premises as of the Possession Date noted above and elects to complete the unfinished items at Landlord's expense, subject to the terms and conditions of the Lease and the Landlord Work Modification Letter.

☐ Tenant does not accept possession of the Premises because the items of Landlord's Work indicated below are not complete. However, Tenant, at its option, may enter the Premises to begin performing Tenant's improvements in accordance with the Lease.

☐ Tenant hereby refuses possession of the Premises because the items of Landlord's Work indicated below are not complete.

Incomplete Items of Landlord's Work: _____

_____

_____

_____

[Attach additional pages if needed]

From and after the date hereof, all notices should be delivered to Tenant at the address set forth in Section 25 of the Lease.

Landlord:                                    Tenant:

Print Name: _____          Print Name: _____

Title: _____               Title: Construction Manager

Date: _____                Date: _____

D-1

© 2001 Starbucks Corporation
STARBUCKS

EXHIBIT E

## LANDLORD WORK MODIFICATION LETTER

Project Name: _____    Store #: _____

Date: _____    Square Footage: _____

Tenant: Starbucks Corporation    Landlord: _____

Premises Address: _____

The scope of work outlined below will constitute an agreement between the Landlord and Tenant. This agreement allows Tenant to complete the following scope of work for the Landlord with the understanding and agreement that the Landlord will be responsible to reimburse Tenant for the following:

Scope of work to be completed by Starbucks:

(Description) – (Item cost)
(Description) – (Item cost)
(Description) – (Item cost)

Total: _____

This letter serves as an agreement between Landlord and Tenant. Landlord agrees to pay Tenant the amount of _____ dollars and _____ cents ($ _____ ) within ten (10) days of receipt of invoice, for the completion of Landlord work as noted above.

From and after the date hereof, all notices shall be given to Tenant as required by the Lease.

LANDLORD:    TENANT:

By: _____    By: _____

Print Name: _____    Print Name: _____

Title: _____    Title: _____

Date: _____    Date: _____

E-1

© 2001 Starbucks Corporation
Revised 03/28/01

STARBUCKS

**EXHIBIT F**

**DATE CERTIFICATE**

*Date*

*Attn: Name*
*Company Name*
*Address*
*City, State, Zip*

Re:    Starbucks Coffee at
       *City, State*
       Starbucks Store # _____

Dear *Name*:

Please confirm the following list of dates pursuant to the Lease by and between _____
and Starbucks Corporation for the above referenced location:

Possession Date:              ___/___/___
Permit Date:                  ___/___/___  [if referenced in the Lease]
Commencement Date:            ___/___/___
Starbucks Store Opening Date: ___/___/___
Rent Commencement Date:       ___/___/___
Expiration Date:              ___/___/___

Pursuant to Section _____ of the Lease, the Base Rent schedule shall be as set forth below:

___/___/___  -  ___/___/___   $_____   Pro-rated: $_____   ÷ ____ days x ____
___/___/___  -  ___/___/___   $_____   Per month
___/___/___  -  ___/___/___   $_____   Per month
day(s)

[If applicable:]
Option1    ___/___/___  -  ___/___/___   $_____   Per month
Option2    ___/___/___  -  ___/___/___   $_____   Per month
Option3    ___/___/___  -  ___/___/___   $_____   Per month
Option4    ___/___/___  -  ___/___/___   $_____   Per month

Please have both copies of this letter signed and dated by the Landlord and return one (1) of the
originals in the envelope provided. If you have any questions regarding the above information
please contact *Name* at *(phone number)*.

Agreed to this _____ day of _____ 200__, by and between:

Landlord:                     Starbucks Corporation:

By: _____          By: _____
    *Signature Name*              *Signature Name*

    _____              _____
                                  *title*

F-1                           © 2001 Starbucks Corporation
                              Revised 02/2001  STARBUCKS

printed name and title

F-2

© 2001 Starbucks Corporation
Revised STARBUCKS

EXHIBIT G

USE RESTRICTIONS

I-1

© 2001 Starbucks Corporation
Revised 5/14/01
STARBUCKS

EXHIBIT B
TO
SPECIAL WARRANTY DEED

(Use and Operating Restrictions, and Affirmative Covenants)

The Grantee herein covenants and agrees, for itself, and for its grantees, successors and assigns, and their respective grantees, successors and assigns (including, without limitation, all successors in title to the Property (or any portion thereof) to Grantee) (collectively, the "Grantee Parties"), that the following Use and Operating Restrictions, and Affirmative Covenants shall bind and restrict the Property for the time periods set forth herein:

1. **Petroleum and other Restrictions:** No part of the Property shall be used by Grantee or any other Grantee Party for an automobile service station, petroleum station, gasoline station or automobile repair shop, or for the purpose of conducting or carrying on the business of selling, offering for sale, storing, handling, distributing or dealing in petroleum, gasoline, diesel fuel, kerosene, benzol, naphtha, greases, lubricating oils, any fuel used for internal combustion engines, lubricants in any form, automobile parts or accessories, tires, batteries, or other petroleum or petroleum-related products or convenience store, quick service restaurant, the sale of petroleum or consumption of such products by Grantee or other occupants of the Property. Convenience store shall mean any retail business with its primary emphasis placed on providing the public a convenient location to quickly purchase from a wide array of consumable products (predominantly food or food and gasoline) and services.

The above covenants and use restrictions running with the land and are deemed to benefit Grantee as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect for a term of twenty (20) years from the date of this conveyance whereupon these restrictive covenants will automatically lapse and terminate and be of no further force or effect.

2. **Groundwater Use Restriction:** No water wells, either for potable or other use, with the exception of remediation, monitoring, or investigation wells, will be installed on any part of the Property. No Grantee Party shall install remediation or monitoring wells without the prior written consent of Grantor.

The above covenant and use restriction binds and restricts the Property as a covenant and restriction running with the land and is deemed to benefit Grantor as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. This restrictive covenant will remain in full force and effect indefinitely, unless waived in writing by Grantor (at which time this restrictive covenant will lapse and terminate and be of no further force or effect).

STARBUCKS

3.   **Residential Use Restriction:**  The Property shall be used solely and exclusively for commercial (which may include retail) and/or industrial purposes. If applicable state environmental laws and regulations define commercial and/or industrial use, any use which is deemed not to be a commercial or industrial use as m the terms are used herein.

No part of the Property will be used for residential purposes or for the purpose of operating a child care or other care facility, a nursing home facility or hospice, a medical or dental facility, a school, a church or other place of worship, a park or a hospital.

The above covenants and restrictions bind and restrict the Property as covenants and restrictions running with the land and are deemed to benefit Grantee as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect indefinitely, unless waived in writing by Grantee (at which time these restrictive covenants will lapse and terminate and be of no further force or effect).

4.   **Construction and Excavation Restrictions**

4.1.   **Soil Remediation and Disposal.**  No soils shall be excavated at or removed from the Property, unless the soil is excavated and/or removed to a disposal facility approved in writing in advance by Grantee (in the case of removal of soil) to a disposal facility approved in writing in advance by Grantor. Management, treatment and/or disposal of soil at or from the Property must be approved by written plan in form and substance acceptable to Grantor (a "Soil Management Plan") that will be developed at the times of Grantee's (or any other Grantee Party's) request for removal or excavation of soil. Except as may be specifically be provided in the Soil Management Plan which has been approved by Grantee, or as may be provided in any contractual relationship between the parties, Grantor shall not be obligated to pay any cost related to the excavation and/or development of the Property.

Grantee and the other Grantee Parties shall be solely responsible for any and all soil excavation, hauling, transportation, and disposal costs pursuant to the Soil Management Plan.

The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and are deemed to benefit Grantee as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect indefinitely, unless waived in writing by Grantee (at which time these restrictive covenants will lapse and terminate and be of no further force or effect).

4.2   **Basement/Excavation Restriction.**  No basements or other underground improvements, with the exception of building footings and underground utilities, will be constructed on the Property.

The above covenant and use restriction running with, the land and is deemed to benefit Grantor as an covenant and restriction running with the land and is deemed to benefit Grantor as an

STARBUCKS

owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. This restrictive covenant will remain in full force and effect indefinitely, unless waived in writing by Grantor (at which time this restrictive covenant will lapse and terminate and be of no further force or effect).

4.3    Relocation of Monitoring Wells and Remediation Equipment.    In the event that monitoring wells or other remediation equipment (collectively the "Remediation Equipment") owned by Grantor or its contractors or consultants are: (i) present at the Property on the date of this conveyance, (ii) subsequently required to be present on the Property after the date of this conveyance by any local, state, or federal agency having jurisdiction over the Property, or (iii) otherwise installed at the Property by Grantor or its contractors or consultants, no Grantee Party will interfere with the use or operation of any Remediation Equipment, or disrupt or permit the damage or destruction of any Remediation Equipment.    In the event Grantee or any other Grantee Party damages or destroys any Remediation Equipment, Grantee or such other Grantee Party (as applicable) shall pay, upon demand, Grantor's costs fit repairing or replacing the same.

No Grantee Party shall remove or relocate any Remediation Equipment without the prior written consent of Grantor.    In the event that Grantor consents to any such removal or relocation, then either (at Grantor's sole election): (i) Grantee (or such other Grantee Party (as applicable)) shall perform such removal and/or relocation at its sole cost, and expense, pursuant to plans and specifications which have been approved in writing by Grantor, and using contractors acceptable to Grantor (in which event Grantee and its contractors and consultants shall have the right to be present at, and supervise, such removal or relocation), or (ii) Grantor shall perform (or cause to be performed) such removal and/or relocation, but all costs and expenses of such removal or relocation shall be borne solely by Grantee or such other Grantee Party (as applicable), and Grantee or such other Grantee Party (as applicable) shall promptly reimburse Grantor for any such costs or expenses paid, sustained or incurred by Grantor.

The above covenants and use restrictions bind and restrict the Property as covenants and restrictions running with the land and are deemed to benefit Grantor as owner of lands or lands in DuPage County, Illinois, or as the operator of retail operations in such County.    These restrictive covenants will remain in full force and effect indefinitely, unless waived in writing by Grantor (at which time these restrictive covenants will lapse and terminate and be of no further force or effect).

4.4    Engineered Barrier.    All portions of the Property, which are, from time to time or at any time, used for any purpose similar to any of the foregoing, shall at all times be covered with an engineered barrier consisting of a concrete or asphalt surface, or such other impermeable surface which is approved by applicable state or federal regulations, and which is sufficient to inhibit the inhalation or ingestion of contaminated media and to impede contaminant migration to any groundwater at or adjacent to the Property. Said concrete or asphalt surface on the Property shall be maintained and kept in good repair by Grantee and the other Grantee Parties (at their sole cost and expense) in compliance with all laws, rules, restrictions, ordinances and court orders.

STARBUCKS

and restrictions running with the land and are deemed to benefit Grantor as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect indefinitely, unless waived in writing by Grantor (at which time these restrictive covenants will lapse and terminate and be of no further force or effect).

4.3    Construction Workers' Caution Statement:

Prior to conducting any intrusive activities with respect to the Property, Grantee and the other Grantee Parties shall cause all construction workers performing or existing with such activities to be notified of possible petroleum hydrocarbon encumbent and appropriately trained and certified in accordance with all environmental, health and safety laws, rules, regulations and ordinances, including, without limitation, any and all Occupational Safety and Health Administration (OSHA) Hazardous Waste Operations and Emergency Response (HAZWOPER) requirements (including without limitation, those set forth in 29 C.F.R. 1910.120). Such training shall at a minimum include an initial 40 hour and future 8 hour refresher training and certifications in compliance with OSHA HAZWOPER requirements (and any similar applicable requirements (whether existing as of the date of this conveyance or enacted or promulgated in the future).

The above covenants and use restrictions bind and relate the Property as covenants and restrictions running with the land and are deemed to benefit Grantor as an owner or lessee of lands in DuPage County, Illinois, or as the operator of retail operations in such County. These restrictive covenants will remain in full force and effect indefinitely, unless waived in writing by Grantor (at which time these restrictive covenants will lapse and terminate and be of no further force or effect).

5.    Certain Environmental Covenants:

5.1    Cooperation. Grantee and each of the other Grantee Parties agrees to cooperate with Grantor and with all local, state, and federal environmental agencies having jurisdiction over the Property in obtaining environmental site closure, to commercial standards, for any environmental contamination relating to or arising out of Grantor's prior use of the Property. Said cooperation may include, but not be limited to, the following:

(i) execution of any and all documentation as may be necessary, in Grantor's sole discretion, to obtain 'environmental site closure for the Property (which documentation may (x) include an IEPA LUST Form, in form and substance acceptable to Grantor, and/or (y) impose further use and operating restrictions (and/or use and operating restrictions similar to those set forth in this Exhibit B) on the use of the Property by Grantee and the other Grantee Parties);

(ii) attendance at any meetings requested by Grantor relating to environmental contamination and remediation efforts on the Property (and/or any contamination that may have migrated from the Property to adjacent properties); and/or

STARBUCKS

**EXHIBIT H**

**ENVIRONMENTAL REPORTS**

1. List of Reports Reviewed:

| Name of Report | Preparer | Date |
|---|---|---|
| Letter to Mr. Dean Papedakis concerning the LUST Incident #2004-0159 | Industries | August 23, 2007 |
| Letter to BP Products North America, Inc. ("BP") approving the Stage 2 Site Investigation Plans ("SIP") dated October 12, 2006 and November 9, 2006 regarding LUST Incident #2004-0159, BP Service Station #9828 located at 1003 Roosevelt Road | Illinois Environmental Protection Agency ("IEPA") | November 30, 2006 |
| Letter to the IEPA including the Stage 2 SIP Budget – Addendum regarding LUST Incident #2004-0159 | Atlantic Richfield Company ("Atlantic") | November 9, 2006 |
| Letter to the IEPA including the Stage 2 SIP regarding LUST Incident #2004-0159 | Atlantic | October 12, 2006 |
| Asbestos Abatement Report | Midwest Engineering Services, Inc. ("Midwest") | June 30, 2006 |
| Asbestos Survey | Midwest | April 14, 2006 |
| Letter to BP approving the Stage 1 SIP dated May 26, 2004 regarding LUST Incident #2004-0159 | IEPA | June 25, 2004 |
| Letter to the IEPA including the SIP with Budget regarding LUST Incident #2004-0159 | Delta Environmental Consultants, Inc. ("Delta") | May 26, 2004 |
| Letter to BP regarding the 45-Day Report dated March 25, 2004 regarding LUST Incident #2004-0159 | IEPA | April 6, 2004 |
| Letter to the IEPA including the 45-Day Report regarding LUST Incident #2004-0159 | Delta | March 25, 2004 |
| Restrictive Covenant Implementation Form | Unknown | February 20, 2004 |
| Letter to Property Owner regarding status of the LUST Incident #2004-0159 | Delta | February 20, 2004 |
| Environmental Addendum to the Sales Worksheet noting 3 USTs were removed from the site | Delta | Unknown |
| IEPA LUST Program, Owner/Operator Property Summary regarding LUST Incident #2004-0159 | Unknown | Unknown |
| IEPA, LUST Program 20-Day Certification regarding LUST | BP/Delta | February 13, 2004 |

© 2001 Starbucks Corporation
Revised STARBUCKS

| Incident #2004-0159 | | |
|---|---|---|
| PMS Site Compliance Reports | Veeder-Root Fuel Management Service ("Veeder-Root") | March 4, 2003<br>February 10, 2003<br>January 7, 2003<br>December 4, 2002<br>November 5, 2002<br>October 9, 2002<br>September 20, 2002<br>July 4, 2002<br>June 6, 2002<br>May 2, 2002<br>April 4, 2002 |
| Permit for Upgrade or Repair of UST(s) and Piping for Petroleum and Hazardous Substances | Office of the Illinois State Fire Marshal ("State Fire Marshal") | March 5, 2002 |
| PMS Site Compliance Reports | Veeder-Root | March 5, 2002<br>February 4, 2002<br>January 4, 2002<br>December 6, 2001<br>November 15, 2001<br>October 4, 2001<br>August 31, 2001<br>August 2, 2001<br>July 3, 2001<br>June 1, 2001 |
| Letter to Amoco Oil Company ("Amoco") regarding Compliance with the Notice of Violation dated January 29, 2001 | State Fire Marshal | May 25, 2001 |
| UST Equipment Inspection Report | BP/Tanknology | May 15, 2001 |
| PMS Site Compliance Report | Veeder-Root | April 27, 2001 |
| Letter to the State Fire Marshal regarding the Notice of Violation dated February 21, 2001 | BP | April 19, 2001 |
| PMS Site Compliance Reports | State Fire Marshal | April 2, 2001 |
| Letter to Amoco regarding the Notice of Violation dated January 29, 2001 | State Fire Marshal | March 27, 2001 |
| PMS Site Compliance Reports | Veeder-Root | March 1, 2001<br>February 1, 2001<br>January 4, 2001<br>November 28, 2000<br>October 27, 2000<br>September 28, 2000 |
| Monthly Compliance Reports | Veeder-Root | September 5, 2000<br>July 28, 2000<br>June 29, 2000<br>June 2, 2000<br>April 28, 2000 |
| Cathodic Protection Compliance Survey | Tanknology | April 5, 2000 |

© 2001 Starbucks Corporation<br>Reproduced with permission STARBUCKS

| Description | Entity | Date |
|---|---|---|
| Monthly Compliance Reports | Veeder-Root | March 31, 2000<br>March 1, 2000 |
| Cathodic Protection Compliance Survey | Tanknology | February 8, 2000 |
| Monthly Compliance Reports | Veeder-Root | January 31, 2000<br>December 29, 1999 |
| Letter to the IEPA regarding the Recorded No Further Remediation Letter dated November 15, 1999 for LUST Incident #91-2684 | BP Amoco | December 27, 1999 |
| Letter to Amoco regarding Extension Request for LUST Incident #91-2684 | IEPA | December 17, 1999 |
| Monthly Compliance Report | Veeder-Root | November 30, 1999 |
| No Further Remediation Letter to Amoco regarding LUST Incident #91-2684 | IEPA | November 15, 1999 |
| Monthly Compliance Report | Veeder-Root | October 28, 1999<br>September 30, 1999<br>August 27, 1999 |
| Letter to the IEPA regarding Extension Request – Institutional Controls for LUST Incident #91-2684 | Delta | August 25, 1999 |
| Monthly Compliance Report | Veeder-Root | July 30, 1999 |
| Letter to Amoco regarding approval for Data Evaluation Extensions, Field Work Extensions, Off-site Access Requests, and Highway Authority Agreement Extensions for LUST Incident #91-2684 | IEPA | June 14, 1999 |
| Monthly Compliance Report | Veeder-Root | June 7, 1999 |
| Letter to the IEPA requesting Extension to demonstrate completion of the Highway Agreements regarding LUST Incident #91-2684 | Delta | May 19, 1999 |
| Monthly Compliance Report | Veeder-Root | May 14, 1999 |
| Letter to Amoco regarding approval for Data Evaluation Extensions, Field Work Extensions, Off-site Access Requests, Highway Authority Agreement Extensions, and Property Owner Negotiation Extension for LUST Incident #91-2684 | IEPA | April 28, 1999 |
| Monthly Compliance Report | Veeder-Root | April 7, 1999 |
| Monthly Compliance Report | Amoco | April 5, 1999 |
| IEPA LUST Program Form, LUST Incident #91-2684 | Veeder-Root | March 8, 1999<br>February 10, 1999<br>January 7, 1999<br>December 14, 1998 |
| Monthly Compliance Reports | Veeder-Root | |
| Compliance Reports | Veeder-Root | November 5, 1998<br>October 5, 1998 |
| 1998 UST Upgrade Declaration | State Fire Marshal | September 21, 1998 |

© 2001 Starbucks Corporation
STARBUCKS

| Document | Entity | Date |
|---|---|---|
| Compliance Report | Veeder-Root | September 6, 1998 |
| Letter to Amoco regarding approval for Highway Authority Agreement, Extensions, Off-site Access Requests, and Field Work Extensions in connection with LUST Incident #91-2684 | IEPA | September 2, 1998 |
| Letter to the IEPA regarding the Highway Agreement in connection with LUST Incident #91-2684 | Delta | August 10, 1998 |
| Compliance Reports | Veeder-Root | August 6, 1998<br>July 6, 1998<br>June 5, 1998<br>May 5, 1998<br>May 4, 1998 |
| Letter to Amoco disapproving the Closure Report dated January 12, 1998 regarding LUST Incident #91-2684 | IEPA | May 4, 1998 |
| Compliance Reports | Veeder-Root | April 21, 1998<br>March 5, 1998<br>February 5, 1998<br>January 12, 1998 |
| Closure Report regarding LUST Incident #91-2684 | Delta | January 12, 1998 |
| Compliance Report | Veeder-Root | December 2, 1997 |
| State Fire Marshal Notification Form for USTs | Amoco | October 14, 1997 |
| Compliance Reports | Veeder-Root | October 6, 1997<br>September 16, 1997<br>August 5, 1997<br>July 21, 1997 |
| UST Test Report | Veeder-Root | June 25, 1997 |
| State Fire Marshal Notification Form for USTs | Amoco | June 17, 1997 |
| Exception Report regarding Line Failure | Unknown | June 1997 |
| Permit for Upgrade or Repair of UST(s) and Piping for Petroleum and Hazardous Substances | State Fire Marshal | April 30, 1997 |
| Letter to the IEPA regarding Groundwater Results for LUST Incident #91-2684 | Delta | January 31, 1997 |
| Permit for Upgrade or Repair of UST(s) and Piping for Petroleum and Hazardous Substances | State Fire Marshal | September 21, 1996 |
| Letter to Amoco regarding Compliance with Order dated September 14, 1995 | State Fire Marshal | July 26, 1996 |
| State Fire Marshal Notification Form for USTs | Amoco | July 2, 1996 |

I-5

© 2001 Starbucks Corporation
STARBUCKS
Revised...

| | | |
|---|---|---|
| Permit for Upgrade or Repair of UST(s) and Piping for Petroleum and Hazardous Substances | State Fire Marshal | January 12, 1996 |
| Letter to Amoco regarding Violation Notice | State Fire Marshal | September 14, 1995 |
| Letter to the IEPA regarding the Groundwater Monitoring Summary for LUST Incident #91-2684 | Amoco | July 27, 1995 |
| Letter to Amoco regarding Non-compliance with the Administrative Order dated October 19, 2003 | State Fire Marshal | May 10, 1995 |
| Letter to the IEPA regarding the Subsurface Investigation Report for LUST Incident #91-2684 | Amoco | March 6, 1995 |
| Subsurface Investigation Report | Fugro Midwest, Inc. ("Fugro") | February 24, 1995 |
| Soil Vapor Extraction Pilot Test Results | Fugro | October 27, 1994 |
| Letter to the IEPA regarding the Groundwater Monitoring Summary for LUST Incident #91-2684 | Amoco | October 17, 1994 |
| Letter to City of Wheaton, Engineering Department regarding Off-site Access Permitting | Fugro | September 23, 1994 |
| Letter to Amoco regarding the Groundwater Monitoring Summary | Fugro | April 6, 1994 |
| Letter to Amoco disapproving the Corrective Action Plan dated January 31, 1994 in connection with LUST Incident #91-2684 | IEPA | March 10, 1994 |
| Corrective Action Plan regarding LUST Incident #91-2684 | Fugro | January 31, 1994 |
| Letter to the IEPA regarding the Groundwater Monitoring Summary | Amoco | January 13, 1994 |
| Letter to Mobil Oil Corporation regarding Mobile Service Station located 1000 East Roosevelt Road, LUST Incident #86-0108 and #90-0897 | IEPA | June 21, 1994 |
| Letter to Amoco regarding the Technology Definition Report for Amoco Station #9828 | Fugro | January 19, 1993 |
| Letter to the IEPA regarding LUST Incident #91-2684 | Fugro | October 16, 1992 |
| Letter to Amoco regarding the 45-Day Report dated August 1992 for LUST Incident #91-2684 | IEPA | October 1, 1992 |
| Letter to Amoco regarding the 45-Day Report dated August 1992 for LUST Incident #91-2684 | IEPA | September 2, 1992 |
| Final Assessment Report, LUST Incident #91-2684 | Fugro | August 4, 1992 |

© 2001 Starbucks Corporation

| | | |
|---|---|---|
| Subsurface Investigation and Soil Excavation at the Suburban Buick Property located adjacent to the Amoco Station | Fugro | June 16, 1992 |
| Permit for Upgrade or Repair of UST(s) and Piping for Petroleum and Hazardous Substances | State Fire Marshal | May 12, 1992 |
| Letter to the IEPA regarding status of activities in connection with LUST Incident #91-2684 | Fugro | April 20, 1992 |
| State Fire Marshal Notification Form for USTs | Amoco | February 12, 1992 |
| Letter to the IEPA regarding the 20-Day Corrective Action Report for LUST Incident #91-2684 | IEP Environmental Consultants ("IEP") | December 19, 1991 |
| Letter to Amoco regarding Emergency Subsurface Investigation at Amoco Service Station #9828 | IEP | September 20, 1991 |
| Notification for USTs | Amoco | April 25, 1986 |

I-7

Store # 13787

# FIRST AMENDMENT TO
# COMMERCIAL LEASE

THIS FIRST AMENDMENT TO COMMERCIAL LEASE (the "Amendment") is made this _28_ day of _December_____, 200 _7_ by and between CTK, LLC, a Kansas limited liability company ("Landlord") and Starbucks Corporation, a Washington corporation ("Tenant"). Landlord and Tenant may be hereinafter referred to collectively as the "Parties."

## RECITALS

This Amendment is made with reference to the following facts and objectives:

A.    The Parties entered into that certain Commercial Lease, dated September 13, 2007 (the "Lease"), covering certain commercial property located at the Northeast corner of President Street and Roosevelt Road in Wheaton, Illinois (the "Premises").

B.    The Parties wish to amend the Lease to change the Scheduled Delivery Date from May 1, 2008 to August 15, 2008.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1.    Delivery. Section 2.2 of the Lease is hereby amended by deleting the date "May 1, 2008" referenced in line 6 and inserting in its place and stead the following date: August 15, 2008.

2.    Miscellaneous.

2.1    Continuing Effect. Except as specifically provided in this Amendment, the provisions of the Lease shall remain unchanged and in full force and effect. In the event of a conflict between the Lease and this Amendment, this Amendment shall control.

2.2    Authority. Each person executing this Amendment on behalf of a party represents and warrants that it has the full power, authority, and legal right to execute and deliver this Amendment on behalf of such party and that this Amendment constitutes the legal, valid and binding obligations of such party, its heirs, representatives, successors and assigns, enforceable against such party or parties in accordance with its terms.

2.3    Approvals. Landlord represents and warrants to Tenant that Landlord has obtained any approvals from any third parties, including lender(s), that are necessary to make this

1

STARBUCKS

Store # 13787

Amendment enforceable against Landlord and all such third parties, their heirs, representatives, successors and assigns.

IN WITNESS WHEREOF, the Parties have duly executed this Amendment effective as of the day and year set forth above.

TENANT:

STARBUCKS CORPORATION,
a Washington corporation

By

      MICHAEL MALANGA
       senior vice president,
       Store Development

LANDLORD:

CTK LLC
a KANSAS LIMITED LIABILITY COMPANY

By
Its Member

STARBUCKS

2

Store # 13787

STATE OF WASHINGTON )
                            ) ss.
COUNTY OF KING     )

On this 2*8* day of _December_, 2006, before me, the undersigned, a Notary Public in and for the State of Washington, duly commissioned and sworn, personally appeared _Mike Malyn_, to me known to be the _Senior VP_ of STARBUCKS CORPORATION, a Washington corporation, the corporation that executed the foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that he is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year this certificate above written.

_Xaverie A. Persiani_
NOTARY PUBLIC, in and for the State of Washington
residing at _King County_
Commission expires: _6/29/11_
Print Name: _Xaverie A. Persiani_

STATE OF _KS_     )
                ) ss.
COUNTY OF _Jo_  )

On this 7 day of _Jan_, 2008, before me, the undersigned, a Notary Public in and for the State of _Kansas_, duly commissioned and sworn, personally appeared _Chris Kamberis_, to me known to be the _Member_ of _CTK, LLC_, the corporation that executed the foregoing instrument and acknowledged the said instrument to be the free and voluntary act and deed of said corporation for the uses and purposes therein mentioned, and on oath stated that _HE_ is authorized to execute said instrument.

WITNESS my hand and official seal hereto affixed the day and year this certificate above written.

_Celia Brookner_
NOTARY PUBLIC, in and for the State of

NOTARY PUBLIC - State of Kansas
CELIA BROOKNER
My Appt. Exp. 12/19/2010

residing at _____
Commission expires: _12/19/2010_
Print Name: _Celia Brookner_

3

STARBUCKS